*409 E. GRADY JOLLY, Circuit Judge:
Sitting as an en banc court, we consider whether the district court properly enjoined the “operation and effect” of the Louisiana state tort statute at issue, which provides a private cause of action against medical doctors performing abortions. Although, in this facial attack on the constitutionality of the statute, consideration of the merits may have strong appeal to some, we are powerless to act except to say that we cannot act: these plaintiffs have no case or controversy with these defendants, the Governor and Attorney General of Louisiana, and consequently we lack Article III jurisdiction to decide this case. Seven members of this en banc court conclude that the panel was in serious error, as indeed is the dissent, in finding that this ease presents an Ex parte Young exception to the Eleventh Amendment immunity from suit in federal court, which these defendants, the Governor and Attorney General of Louisiana, enjoy. Accordingly, we reverse, vacate, and remand for entry of a judgment of dismissal.
I
Dr. Ifeanyi Charles Anthony Okpalobi (“Okpalobi”), joined through intervention by five health care climes and other physicians, individuals, and businesses who perform abortions in the State of Louisiana,[1] challenge the constitutionality of La. R.S. Ann., tit. 9, § 2800.12 (West Supp.1999), or, more commonly, “Act 825.”[2] The defendants are Mike Foster, Governor of Louisiana, and Richard Ieyoub, Attorney General of Louisiana.[3] No patients of the plaintiffs appear as parties in this suit.
Act 825 provides to women who undergo an abortion a private tort remedy against the doctors who perform the abortion. It exposes those doctors to unlimited tort liability for any damage caused by the abortion procedure to both mother and “unborn child.” Damages may be reduced, but not eliminated altogether (and perhaps not at all with respect to any damages asserted on behalf of the fetus), if the pregnant woman signs a consent form prior to the abortion procedure.
*410 The plaintiffs argue that Act 825 constitutes an “undue burden” on a woman’s right to obtain an abortion and is thus unconstitutional under Planned, Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The plaintiffs further claim that the Act will force physicians in Louisiana to cease providing abortion services to women because of the potential exposure to civil damage claims authorized by the Act.[4] Finally, the plaintiffs assert that, if they are forced to discontinue providing their services, the State may have achieved in practical terms what it could not constitutionally do otherwise— eliminate abortions in Louisiana.
II
The district court granted a temporary restraining order enjoining implementation of the Act on August 14, 1997. Act 825, according to the district court, “has the purpose and effect of infringing and chilling the exercise of constitutionally protected rights.” The court therefore granted the plaintiffs’ request for a preliminary injunction on January 7, 1998. See Okpalobi v. Foster, 981 F.Supp. 977, 986 (E.D.La.1998). The following month, finding that the Act places an unconstitutional undue burden on a woman’s right to abortion, the court converted the temporary injunction into a permanent injunction.[5] The State timely appealed.
On appeal, a panel of this court upheld the injunction. Okpalobi v. Foster, 190 F.3d 337 (5th Cir.1999). The panel specifically addressed the Eleventh Amendment issue — whether, under Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the state official defendants had sufficient “connection” to the act in question to overcome the Eleventh Amendment bar of suits against states in federal court.[6] The panel determined that “the Governor and the Attorney General have powers and duties under state law sufficient to meet the minimum requirements under the Eleventh Amendment.” Okpalobi, 190 F.3d at 346. The panel further concluded that the plaintiffs had standing to assert their rights and the rights of their patients. Id. at 350-353. The panel then concluded that a case and controversy existed between these plaintiffs and defendants and affirmed the district court’s holding that Act 825 is unconstitutional in its entirety.
In addressing the issues before this en banc court, we first take note that the panel opinion’s jurisdictional holding rested primarily on the Ex parte Young exception to the Eleventh Amendment. It is, of course, one of the purposes of taking a case en banc to clarify the^ law when a “panel decision conflicts with a decision of the United States Supreme Court” or the case “involves one or more questions of exceptional importance.” Fed.RApp.P. 35(b)(1). Because the panel opinion erroneously applied established Eleventh Amendment jurisprudence, and because it was the focus of its jurisdictional holdings, we first address those panel errors before turning to the more basic question of whether this case presents an Article III case or controversy.
Ill
The crux of the Eleventh Amendment issue in this case is whether the named defendants, Louisiana’s Governor and At *411 torney General, have the requisite “connection” to the statutory scheme to remove the Eleventh Amendment barrier to suits brought in federal court against the State. We first say a very brief word about the historical and constitutional forces that underlie the Eleventh Amendment.
The Eleventh Amendment was adopted in 1798 in direct response to the Supreme Court’s decision in Chisholm v. Georgia, 2 U.S. (2 Dali.) 419, 1 L.Ed. 440 (1793), holding that the State of Georgia could properly be called to defend itself in federal court against a citizen’s suit. The alacrity with which Congress and the states approved the Eleventh Amendment to nullify Chisholm evinces the absolutely certain and fundamental respect the early fathers demanded the federal courts pay to the sovereignty of the several states.[7] Although the attention given to the Eleventh Amendment has waxed and waned in the two hundred years since its adoption, the importance of it as a structural definition of our constitutional system has never been doubted. Thus, the Supreme Court recently reemphasized that this structural principle remains intact in Alden v. Maine, 527 U.S. 706, 713, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). There, the Court stated that “as the Constitution’s structure, and its history, and the authoritative interpretations by this Court make clear, the States’ immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratifications of the Constitution, and which they retain today.”[8] Indeed, it is “a settled doctrinal understanding, consistent with the leading advocates of the Constitution’s ratification, that sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself.” Id. at 728, 119 S.Ct. 2240.
It is against this background of the overriding importance of the Eleventh Amendment in limiting the power of the federal courts over the sovereignty of the several states, that we now consider whether the facts of this appeal can fit into the exception carved from the Eleventh Amendment in Ex parte Young, so as to allow the federal courts to enjoin Act 825.
IV
A
The Eleventh Amendment bars suits by private citizens against a state in federal court, irrespective of the nature of the relief requested. See Hutto v. Finney, 437 U.S. 678, 700, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). A plaintiff may not avoid this bar simply by naming an individual state officer as a party in lieu of the State. Yet, few rules are without exceptions, and the exception to this rule allows suits against state officials for the purpose of enjoining the enforcement of an unconstitutional state statute. This exception rests on the fiction of Ex parte Young— that because a sovereign state cannot commit an unconstitutional act, a state official enforcing an unconstitutional act is not acting for the sovereign state and therefore is not protected by the Eleventh Amendment. Indeed, the Eleventh Amendment inquiry today turns on a proper interpretation and application of the Supreme Court’s holding in Young.
Young, in relevant part, reads:
If, because they were law officers of the state, a case could be made for ... testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature *412 could be tested by a suit against the governor and the attorney general.... That would be a very convenient way for obtaining a speedy judicial determination of ... constitutional law ..., but it is a mode which cannot be applied to the states ... consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons ... In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, ... such officer must have some connection with the enforcement of the act, or else it is merely making ... the state a party.
209 U.S. at 157, 28 S.Ct. 441 (emphasis added).
The principle of Young grew out of two predecessor cases, and can best be understood by reference to Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), and Fitts v. McGhee, 172 U.S. 516,19 S.Ct. 269, 43 L.Ed. 535 (1899). We begin'with a discussion of these two decisions before addressing Young and its progeny.
B
In Smyth, the plaintiffs challenged the constitutionality of a Nebraska act regulating railroad rates for the transportation of freight and establishing penalties for violations of the act. The statute authorized the assessment of substantial fines by state authorities in addition to private liability. See Smyth, 169 U.S. at 476, 18 S.Ct. 418. The plaintiffs named officers of the State as defendants. The defendants contested the federal court’s jurisdiction on the grounds “that these suits are, in effect, suits against the state, of which the circuit court of the United States cannot take jurisdiction consistently with the eleventh amendment.” 169 U.S. at 518, 18 S.Ct. 418. After holding that “a suit against individuals for the purpose of preventing them as officers of a state from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff is not a suit against the state within the meaning of [the eleventh] amendment,” the court assumed jurisdiction of the case and struck down the law. Id. at 519, 18 S.Ct. 418.[9]
Although Smyth did not raise the question of how close a connection is required between the defendant state officers and the enforcement of the act, the Supreme Court elaborated on the principle when the question was presented the following year in Fitts.[10] There, the court was faced with a constitutional challenge to an Alabama act that prescribed certain maximum rates of toll to be charged on a Tennessee river bridge. The act provided that, if the maximum rate was exceeded, the aggrieved party could recover twenty dollars per infraction from the offender. 172 U.S. at 516, 19 S.Ct. 269. The plaintiffs, arguing that the rates of toll were “arbitrary” and “unreasonable” and constituted a deprivation of property, sued the governor and attorney general of Alabama as defendants and requested injunctive relief. The defendants moved “that the bill be dismissed upon the ground that the suit was one against the state, and prohibited by the constitution of the United States.” Id. at 518, 19 S.Ct. 269.
In concluding that the suit against the governor and attorney general was effec *413 tively a suit against the state and thus barred by the Eleventh Amendment, the Supreme Court reasoned that neither the governor nor the attorney general “appear[s] to have been charged by law with any special duty in connection with the act.” Id. at 529, 19 S.Ct. 269. The court distinguished other cases in which it had exercised jurisdiction (including Smyth) by noting that “the defendants in each of those cases were officers of the state, specially charged with the execution of a state enactment alleged to be unconstitutional.” Id. (emphasis added). Thus, in Fitts, the Supreme Court articulated the requirement that there be a “close” connection or a “special relation” between the statute and the defendant state officer’s duty before the Eleventh Amendment bar could be overcome:
There is a wide difference between a suit against individuals, holding official positions under a state, to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state. In the present case, as we have said, neither of the state officers named held any special relation to the particular statute alleged to be unconstitutional. They were not expressly directed to see to its enforcement.
Id. at 529-30, 19 S.Ct. 269 (emphasis added). The court rationalized this relationship requirement by reference to the core constitutional principle embodied in the Eleventh Amendment:
If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute ... then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes. This would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law ... but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons.
Id. at 530, 19 S.Ct. 269. Thus, Fitts illuminated the important precept that allowing state officers to be sued in lieu of the State absent some “special connection” would permit the narrow exception to swallow the fundamental, constitutionally-based rule. It was upon this foundation that the Young doctrine was constructed.
C
In Young, the plaintiffs challenged a Minnesota statute that created a railroad commission, which executed an order fixing the rates various railroad companies could charge for the carriage of merchandise. 209 U.S. at 127, 28 S.Ct. 441. The legislature delineated specific penalties for violations of such railroad regulations, including fines and possible imprisonment.[11] The attorney general, Edward T. Young, was named as a defendant in the suit, which challenged the constitutionality of the series of state acts regulating the railroad companies.[12] Specifically, the *414 plaintiffs requested “[appropriate relief by injunction against the action of the defendant Young.” Id. at 131, 28 S.Ct. 441. Young asserted that the federal court had no jurisdiction over him as attorney general because the suit was, in effect, against the state of Minnesota and barred by the Eleventh Amendment. Nevertheless, the federal court issued a temporary injunction against Young, enjoining him “from taking or instituting any action or proceeding to enforce the penalties and remedies specified in the act.” Id. at 132, 28 S.Ct. 441. Young ignored the court order and immediately filed a mandamus action in state court to compel the railroad’s compliance with the state law. Young was held in contempt by the federal court and taken into custody. He then petitioned for habeas corpus to the United States Supreme Court, asserting that the federal court injunction violated the Eleventh Amendment. The Supreme Court was thus required to determine whether Young, as a state officer, could be sued in federal court despite the Eleventh Amendment bar.
The court determined that the Eleventh Amendment did not bar a federal court injunction against the enforcement of the state statute. It held that Young, as attorney general, could properly be enjoined in federal court from enforcing unconstitutional state penalties against the railroad. In so holding, the court stated:
The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected [by] an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.
Id. at 155-56, 28 S.Ct. 441 (emphasis added). Finding that Young possessed such enforcement authority over the acts in question, and recognizing his clear threat to exercise said authority under alleged unconstitutional state law,[13] the court concluded that the Eleventh Amendment was no barrier to the suit.[14] In authorizing the suit against Young, the court distinguished the earlier finding of no jurisdiction in Fitts by noting that, in that case, the penalties for disobeying the act were to be collected by the individuals who were overcharged and “[n]o officer of the state had any official connection with the recovery of such penalties.” Id. at 156, 28 S.Ct. 441.
Thus, Young solidified the doctrine that state officers could be sued in federal court despite the Eleventh Amendment, while simultaneously emphasizing the requirements that the officers have “some connection with the enforcement of the act” in question or be “specially charged with the duty to enforce the statute” and be threat *415 ening to exercise that duty. Id. at 157, 158, 28 S.Ct. 441.[15]
D
Young was decided almost 100 years ago. From its earliest years until the present, it has spawned numerous cases upholding, explaining, and recognizing its fundamental principle: that the defendant state official must have some enforcement connection with the challenged statute. Two years after Young, the Supreme Court in Western Union Telegraph Co. v. Andrews, 216 U.S. 165, 80 S.Ct. 286, 54 L.Ed. 430 (1910), again upheld a suit against a state official that enjoined enforcement of a state act. The act in question, which regulated fees to be paid by foreign corporations, declared that the defendant state officials “would, unless restrained by the order of the court, institute numerous actions, as they had threatened to do, for the recovery of the penalties aforesaid.” Id. at 166, 30 S.Ct. 286. Concluding that the recent Young decision was “precisely applicable to the case at bar,” the court found sufficient connection between the defendant state officials and the challenged statute, stating:
The statute specifically charges the prosecuting attorneys with the duty of bringing actions to recover the penalties.It is averred in the bill, and admitted by the demurrer, that they threatened and were about to commence proceedings for that purpose.
Id. Western Union, therefore, reinforced the interpretation that Young requires both a close connection between the official and the act and the threatening or com-meneement of enforcement proceedings by the official.[16]
More recently, other circuit courts have applied the Young guidelines when adjudicating the Eleventh Amendment question raised in this appeal. In Children’s Healthcare v. Deters, 92 F.3d 1412 (6th Cir.1996), the plaintiffs brought a civil rights action against the Ohio Attorney General and state prosecutors. The suit challenged statutes that provided exemptions from the duty to provide adequate care for children for persons who treat children by spiritual means. The court rejected federal court jurisdiction over the matter, reaffirming that “Young does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute.” Id. at 1415. The requirement that there be some actual or threatened enforcement action before Young applies has been repeatedly applied by the federal courts. See also 1st Westco Corp. v. School Dist. of Philadelphia, 6 F.3d 108, 113 (3d Cir.1993) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1209 n. 9 (3d Cir.1988)); Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir.1992); Kelley v. Metropolitan County Bd. of Educ., 836 F.2d 986, 990-91 (6th Cir.1987).
Other federal courts have invoked Young’s, rationale when ascertaining the applicability of this narrow Eleventh Amendment exception. In Gras v. Stevens, 415 F.Supp. 1148 (S.D.N.Y.1976), Judge Friendly rejected the notion that a governor’s general duty to “take care that the laws are faithfully executed” is sufficient connection under Young and Fitts to dissolve the Eleventh Amendment bar. *416 Id. at 1151-52. The court noted that “[i]n our view this would extend Ex parte Young beyond anything which the Supreme Court intended or has subsequently held.” Id. at 1152.
As late as 2001, the Fourth, Ninth, Eleventh and Seventh Circuits rearticulated the criteria of Young. In Lytle v. Griffith, 240 F.3d 404, 412 (4th Cir.2001), the Fourth Circuit, in remanding the case to determine whether the defendant Governor had the requisite connection to the challenged law, noted that “[t]he Young exception is limited, however, by its requirement that named state officials bear a special relation to the challenged statute.” In Snoeck v. Brussa, 153 F.3d 984 (9th Cir.1998), the Ninth Circuit found that the Eleventh Amendment barred a claim against the Nevada Commission on Judicial Discipline, emphasizing that compliance with the requirements of Young “must be determined under state law depending on whether and under what circumstances a particular defendant has a connection with the challenged state law.” Id. at 986. The court concluded that, “[u]nder Nevada law, the Commission has no enforcement power, and therefore, it has no connection to the enforcement of the challenged law as required under Ex Parte Young.” Id. at 987.
Moreover, in Summit Medical Associates, P.C. v. Pryor, 180 F.3d 1326 (11th Cir.1999), the Eleventh Circuit took note of the private civil enforcement provision of the statute in question and stated that “the doctrine of Ex paHe Young cannot operate as an exception to Alabama’s sovereign immunity where no defendant has any connection to the enforcement of the challenged law.” Id. at 1341. Finally, the Seventh Circuit in Hope Clinic v. Ryan, 195 F.3d 857 (7th Cir.1999), vacated on other grounds by 530 U.S. 1271, 120 S.Ct. 2738, 147 L.Ed.2d 1001 (2000), also observed that the statute in question was to be enforced in private litigation: “[T]he states’ Attorneys General and local prosecutors have nothing to do Relief against the public officials therefore would be pointless even if the civil-liability provisions were problematic.” Id. at 875.
E
The Supreme Court’s decision in Young, appraised in the light of its predecessors Smyth and Fitts and its progeny, is thus properly understood to create a precise exception to the general bar against suing states in federal fora. This exception only applies when the named defendant state officials have some connection with the enforcement of the act and “threaten and are about to commence proceedings” to enforce the unconstitutional act. Young, 209 U.S. at 155-56, 28 S.Ct. 441.
We now consider the application of the Young principle to the facts in the case before us.
V
The present inquiry is how to read and apply the requirement that the defendants have some connection with the enforcement of the Act. Specifically, the question raised before this en banc court is whether the Young fiction requires that the defendant state official have some enforcement -powers with respect to the particular statute at issue, or whether the official need have no such enforcement powers and only need be charged with the general authority and responsibility to see that all of the laws of the state be faithfully executed.
A
As we have pointed out, the Young principle teaches that it is not merely the general duty to see that the laws of the state are implemented that substantiates the required “connection,” but the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty. For a duty found in the general laws to constitute a sufficient connection, it must “include!] *417 the right and the power to enforce the statutes of the state, including, of course, the act in question ...” Id. at 161, 28 S.Ct. 441 (emphasis added). Thus, any probe into the existence of a Young exception should gauge (1) the ability of the official to enforce the statute at issue under his statutory or constitutional powers, and (2) the demonstrated willingness of the official to enforce the statute.[17]
Although the panel opinion addressed the connection of the defendants to the law in question, it nevertheless pursued a different, and we believe, seriously erroneous course. The panel applied a two-part formula to assess whether sufficient “connection” exists to warrant waiver of the Eleventh Amendment protection: (1) an analysis of “what powers the defendants wield to enforce the law in question,” and (2) consideration of “the nature of the law and its place on the continuum between public regulation and private action.” Okpalobi, 190 F.3d at 346.[18] We address, in turn, the flaws in each part of the panel’s analysis.
1
After noting at the outset that “Act 825, on its face, does not direct the State or its officers to do anything,” the panel nevertheless concluded “that the Governor and the Attorney General have powers and duties under state law sufficient to meet the minimum requirements under the Eleventh Amendment.” Id. at 347.[19] The basis for this conclusion was the assertion that a mere duty to uphold the laws of the state is sufficient under Young to authorize an Eleventh Amendment waiver. The panel stated that its conclusion is discernible from a proper reading of Young and Smyth, noting that, while the Fitts Court required a “close” connection or a “special charge” between the statute and the state officer’s duty, the Young Court adopted the more relaxed connection requirements outlined in Smyth.[20]
In essence, the panel suggests that there is some conflict between Fitts, on the one hand, and Smyth and Young, noting that “[t]o the extent that there is tension between Fitts’s focus on the state officials’ express enforcement power and the later articulation in Young, we are controlled by the Smyth doctrine and the unequivocal holding of Young that a state officer’s connection with the enforcement of the challenged act can ‘[arise] out of the general law ... so long as it exists.’ ” Id. at 344 (citing Young, 209 U.S. at 157, 28 S.Ct. 441). We do not, however, find this tension in the Smyth-Fitts-Young triad. The resolution in each of these three cases was dictated, not by the application of a different legal rule, but by the particular statutes and the connection to those statutes of the defendant state officials. The challenged statutes in Young and Smyth *418 (wherein the defendants had enforcement powers over the railway acts) stand in sharp contrast to the statute in Fitts (wherein the defendants were granted no enforcement powers whatsoever with respect to the statute).[21] Fitts involved the establishment of toll rates for a single bridge. The act in question was self-enforcing; if the operators of the bridge charged an excessive toll, the statute entitled the aggrieved to sue for twenty dollars.[22] Thus, the court in Young characterized the Fitts statute as one in which
[n]o officer of the state had any official connection with the recovery of such penalties.... As no state officer who was made a party bore any close official connection with the act fixing the tolls, the making of such officer a party defendant was a simple effort to test the constitutionality of such act in that way, and there is no principle upon which it could be done. A state superintendent of schools might as well have been made a party.
Id. at 156, 28 S.Ct. 441. In differentiating the “general duty” authority of the officials in Fitts, which the court found was insufficient to dissolve the Eleventh Amendment bar, the Young Court noted that “[t]he officers in the Fitts case occupied the position of having no duty at all with regard to the act ...” 209 U.S. at 158, 28 S.Ct. 441. The court then referenced with approval a distinction noted by the court in Fitts, wherein the facts in Fitts were clearly distinguished from the facts in Smyth and Reagan v. Farmers’ Loan & Trust Co., 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014 (1894):
In [Smyth and Reagan] the only wrong or injury or trespass involved was the threatened commencement of suits to enforce the statute as to rates, and the threat of such commencement was in each case regarded as sufficient to authorize the issuing of an injunction to prevent the same. The threat to commence those suits under such circumstances was therefore necessarily held to be equivalent to any other threatened wrong or injury to the property of a plaintiff which had theretofore been held sufficient to authorize the suit against the officer.
Young, 209 U.S. at 158, 28 S.Ct. 441.[23]
Considering the obvious enforcement potential that the defendant Young had under the Minnesota statute, the panel’s interpretation of the “some connection” language as necessitating only an undefined, inchoate, general duty to see that all of the laws of the state are enforced exceeded any reasonable interpretation of Young. Indeed, Young does not reject the “special charge” language in Fitts;[24] instead, Young merely allows the *419 “special charge” to be drawn implicitly from the laws of the state, rather than requiring that it be stated explicitly in the challenged statute. Thus, the correct interpretation of Young concludes that no such special charge need be found directly in the challenged statute to meet the requisite “some connection” so long as there is sufficient indicia of the defendant’s enforcement powers found elsewhere in the laws of the state.[25] This interpretation finds support in the following language in Young:
It has not, however, been held that it was necessary that such duty should be declared in the same act which is to be enforced. In some cases, it is true, the duty of enforcement has been so imposed ... but that may possibly make the duty more clear; if it otherwise ex-istís] it is equally efficacious.
209 U.S. at 157, 28 S.Ct. 441.
Thus, the panel erred by not recognizing that Fitts’s “special charge” requirement is an essential part of Young’s holding. See also Gras, 415 F.Supp. at 1151 (characterizing the statute in Young as “implicitly charging] [the attorney general] by statute with the duty of collecting an allegedly unconstitutional tax.”). This failing led to the panel’s conclusion that the general charge of the governor and attorney general to implement and enforce all of the laws of the state satisfies the requirements of Young.
In sum, Young does not minimize the need to find an actual enforcement connection — some enforcement power or act that can be enjoined — between the defendant official and the challenged statute. Instead, it provides that this connection can be found implicitly elsewhere in the laws of the state, apart from the challenged statute, so long as those duties have the same effect as a “special charge” in the statute.
2
We turn now to the second prong of the panel’s test — the place of Act 825 on a public-to-private “continuum.” The panel concluded that Act 825 implicates “public” action because “the purpose and effect of the Act is to prevent women from obtaining legal abortion.” Okpalobi 190 F.3d at 347. This continuum element was derived from Allied Artists Pictures Corp. v. Rhodes, 473 F.Supp. 560 (S.D.Ohio 1979), aff'd 679 F.2d 656, 665 n. 5 (6th Cir.1982) (holding that statutory regulation of private contracting with respect to movies amounted to state regulation of movie producers and distributors). Notwithstanding the equivocal nature of Allied Artists’ “continuum” holding,[26] the majority seized *420 upon this result and compared it to an act affecting availability of abortion services: “We place such interference [with abortion rights] on the Allied continuum near the end closest to laws respecting the voting rights of citizens [see Socialist Workers Party v. Rockefeller, 314 F.Supp. 984 (S.D.N.Y.1970), aff'd, 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970)], rather than alongside procedural aspects of domestic relations law [see Gras, 415 F.Supp.1148].” Okpalobi, 190 F.3d at 347.
The first weakness in the panel’s use of this analysis to find a sufficient connection between the state officials and Act 825 is its almost exclusive reliance on Allied Artists. The sum total of the panel’s support lies in two district court cases, Allied Artists and Federal National Mortgage. Allied Artists is not only not binding on this circuit, but it seems to have been rejected as binding authority in its own circuit. See Children’s Healthcare, 92 F.3d at 1414-15, 1416; see also Kelley v. Metropolitan County Bd. Of Educ., 836 F.2d 986, 990-91 (6th Cir.1987). In Children’s Healthcare, the Sixth Circuit highlighted Allied Artists’ tension with Supreme Court jurisprudence, apparently rejecting the holding that “general duty” provisions are sufficient for purposes of Eleventh Amendment waiver. See 92 F.3d at 1416. See also Kelley, 836 F.2d at 990-91. Furthermore, even Allied Artists — the panel’s sole support for its “continuum” prong — does not support the panel’s argument as to the degree of “connection” required under Young. Allied Artists states:
Although I disagree with Gras insofar as it declines to find Young enforcement power in the governor’s general duty to see to the execution of state laws, I agree with the Oras result. Furthermore, I believe to be accurate Judge Friendly’s evaluation that the cases which have permitted a governor to be joined as a defendant concerned the enforcement of programs, civil or criminal, dealing with the relations between the state and the individual. This valid limitation serves to preclude parties from testing the constitutionality of state legislation by simply naming the governor as defendant, a practice which if unchecked would effectively eviscerate the Eleventh Amendment. Thus, to satisfy the Young fiction, as I understand it, not only must there be a state officer who has a connection imth the enforcement of the challenged statute, but there must also be a real, not ephemeral, likelihood or realistic potential that the connection *421 will be employed against plaintiffs’ interests.
473 F.Supp. at 568 (emphasis added). Thus, the panel’s reliance on Allied Artists places it in the awkward position of relying on a case in support of the second part of its analysis when that case rejects the panel’s conclusion as to the first part.
Second, the panel’s approach ignores the “state/individual” vs. “predominately private/private” distinction set forth in Gras: “[These cases finding no Eleventh Amendment immunity] have been concerned with the enforcement of programs, civil or criminal, dealing with the relations between the state and the individual ...” 415 F.Supp. at 1152. Indeed, the propriety of this distinction was echoed in Allied Artists. See 473 F.Supp. at 568. The panel’s thin retort is simply that Act 825 is “designed to implement and serve the public interest of the state.” Okpabbi, 190 F.3d at 347 (citation omitted). This tautological reasoning, however, can easily be applied to every statute: What statute of general application is not so designed? Even those statutes on the opposite end of the continuum (e.g., domestic relations law in Gras) are presumably enacted to serve the public’s interest in the private ordering of individuals. We therefore doubt whether this analysis serves any real use in determining whether a case improperly tests the constitutionality of a state statute. If Act 825, a private tort statute, is on the public interest side of the continuum, almost anything can be said to affect the public interest. For this and other reasons, we reject the panel’s use of this rationale to resolve the Eleventh Amendment question.
B
In sum, the panel generated a new two-pronged test spun out of hardly more than a wisp of authority (a single district court’s ruling), while ignoring critical factors examined by virtually all prior Eleventh Amendment jurisprudence. For example, we note that the panel’s reading failed to note that the necessary fiction of Young requires that the defendant state official be acting, threatening to act, or at least have the ability to act. Young, 209 U.S. at 159, 28 S.Ct. 441 (noting that the fiction applies “where an official claims to be acting under the authority of the state.”). It is this unconstitutional conduct, or at least the ability to engage in the unconstitutional conduct, that makes him no longer a representative of the sovereign. Without at least the ability to commit the unconstitutional act by the official defendant, the fiction cannot be sustained. See, e.g., Fitts, 172 U.S. at 530, 19 S.Ct. 269; Children’s Healthcare, 92 F.3d at 1415-16. Indeed, if there is no act, or potential act, of the state official to enjoin, an injunction would be utterly meaningless. Here, there is no act, no threat to act, and no ability to act.
VI
A
We take a moment now to address the dissent’s view of the Eleventh Amendment question in this case. The dissent substantially departs from the panel majority opinion, abandoning many of the views expressed therein and raising theories apparently dismissed by the plaintiff-appellees.[27] The panel opinion, as we have noted, exhibited as its centerpiece Allied Artists, a twenty year old Ohio district court case. The dissent now jettisons Allied Artists as support for the panel’s novel position and turns to Title 40 of the Louisiana Revised Statutes, a statutory scheme that attempts to review, regulate, oversee, and partially fund medical malpractice claims. See 22C La.Rev.Stat. Ann. § 40:1299. It quickly becomes clear, however, that Title 40 is an even less reliable ally than was Allied Art *422 ists for the position that these defendants have enforcement powers with regard to Act 825.
This is the essence of the dissent’s argument as best we understand it: Title 40 applies to all medical malpractice claims;[28] the Patients Compensation Fund Oversight Board (“PCFOB”) must review all malpractice claims to determine if they qualify for the damage caps and other benefits provided by Title 40; this oversight authority means that the PCFOB would review all medical malpractice claims based on or related to abortion claims; the PCFOB would have discretionary authority to deny benefits of Title 40 to defendant doctors for procedures determined by the Board to be covered by Act 825; and, because the Governor appoints members of the PCFOB, and because appointees of the Attorney General must approve certain payments ultimately determined to be payable from the Self-Insurance Fund — all the aforementioned acts authorized by Title 40 — each of the defendants has enforcement powers with respect to Act 825. The dissent makes this argument notwithstanding the express provision of Act 825 that “[t]he laws governing medical malpractice or limitations of liability thereof provided in Title 40 of the Louisiana Revised Statutes of 1950 are not applicable to this Section.” See § 2800.12(C)(2) (emphasis added).[29] Furthermore, the dissent makes this argument even though no official connected with Title 40 has been named as a defendant in this case.
Very little need be said about this patently untenable argument. We need not draw attention to the fact that, even under the dissent’s argument) the defendants who have been sued in this case have no enforcement connection with Title 40, much less the statute at issue (Act 825). The most obvious — and fatal' — flaw in the dissent’s effort to connect Act 825 to Title 40 is that the argument is premised and dependent upon a plainly false assumption: the assumption that the agencies operating under Title 40 have jurisdiction, authority, or discretion ever to review or consider any claims brought under Act 825. Act 825 creates a specific cause of action; Act 825 provides that claims brought under the statute are not subject to Title 40; consequently, any governmental bodies or agents acting under Title 40 have no authority or jurisdiction — that is, enforcement powers — over claims brought under Act 825. In short, the foundation of the dissent’s argument, to wit, that “[ujnder Title 40’s medical malpractice system, all malpractice claims against "private and public health care providers must be reviewed by a medical review panel,” is false — the actual fact being that Title 40 applies to all medical malpractice claims except those brought pursuant to Act 825. There is therefore no connection between Title 40 and Act 825. In concluding, however, we emphasize that, notwithstanding the dissent’s newest theory that attempts to relate Act 825 to Title 40, we should not be diverted from the crucial and determinative consideration under Ex parte Young and its progeny: These defendants have no ability to enforce Act 825, a purely private tort statute, which can be invoked only by private litigants.
B
We turn now to comment on the various authorities addressed by the dissent. We *423 would first note that the dissent fails to cite any case in which a federal court enjoined enforcement of a statute even remotely like Act 825 — that is, one with private civil, but no criminal penalties. In every case cited by the dissent to support its claim that an injunction was proper in this case, there were simply no Eleventh Amendment or Article III problems that would bar the court from asserting jurisdiction over the complaint for this reason: federal jurisdiction plainly existed over the claims for injunctive relief to strike the criminal provisions of the statutes at issue in those cases.[30] When there were also civil provisions contained in these statutes they were, without analysis, swept up and bundled as one package with the struck criminal provisions. In no case cited by the dissent did the court address the civil provisions separately under an Ex parte Young analysis, as we are called upon to do today. Indeed, in assessing the value of those cases to the issues before us today, we must conclude that it is determinative that these cases fail to even mention Ex parte Young.
In sum, nothing argued or cited by the dissent suggests that there is any enforcement connection between these defendants — the Governor and the Attorney General — and Act 825 that satisfies either of the requirements of Ex parte Young.[31] *424 It is clear therefore to this en banc court, and we hold, alternatively, that the defendants in this case enjoy Eleventh Amendment immunity from this suit.[32]
VII
Now that we have addressed the Eleventh Amendment issues that have been presented in this case, we turn to the question of jurisdiction under Article III. Recently, the Supreme Court, when confronted with both an Eleventh Amendment and an Article III question, chose to decide the case based on Article III jurisdiction. See Calderon v. Ashmus, 523 U.S. 740, 745, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998) (“[We] have decided that we must first address whether this action for a declaratory judgment is the sort of ‘Article III’ ‘case or controversy’ to which federal courts are limited.”).[33] Calderon does not hold that a court always must, or even *425 always should, decide the Article III issues before addressing Eleventh Amendment issues. Nevertheless, given that the Supreme Court has followed this path in a case that has similarities to today’s case, it is not inappropriate for us to examine, and, if thereby warranted, to decide this case based on the limitations Article III imposes on federal courts.
Under Article III of the Constitution, the federal courts have jurisdiction over a claim between a plaintiff and a defendant only if it presents a “case or controversy.” This is a “bedrock requirement.” Raines v. Byrd, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). In this way, the power granted to federal courts under Article III “is not an unconditioned authority to determine the constitutionality of legislative or executive acts.” Valley Forge Christian College v. Americans United For Separation of Church and State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).
In order to establish a ease or controversy sufficient to give a federal court jurisdiction over their claims, plaintiffs must satisfy three criteria. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, they must show that they have suffered, or are about to suffer, an “injury in fact.” Second, “there must be a causal, connection between the injury and the conduct complained of.” Third, “it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.” Id. (citation omitted). If any one of these three elements — injury, causation, and redressability-is absent, plaintiffs have no standing in federal court under Article III of the constitution to assert their claim.
In the district court, the defendants did not raise the question of whether the plaintiffs had an Article III case or controversy with them, the Governor and the Attorney General, and the district court did not consider this jurisdictional question. The defendants argued only that the plaintiff doctors and clinics lacked standing to pursue their patients’ rights. In rejecting that contention, the district court held that “[g]iven the relationship between the inter-venors and their patients, and given the obstacles which prevent pregnant women from challenging this statute, including a desire for privacy and the imminent mootness of their claims, intervenors may assert third party standing and raise the right of their patients.” Okpalobi v. Foster, 981 F.Supp. 977, 980 (E.D.La.1998). The panel upheld that determination, finding that “the Plaintiffs have alleged an injury in fact, including components of causation and redressability, sufficient to make their claim a case or controversy subject to the federal courts’ Article III jurisdiction.” Okpalobi, 190 F.3d at 350. The panel further determined that plaintiffs could properly assert third-party standing on behalf of their female patients because the plaintiffs “have the requisite commonality and congruence with their patients’ interests to establish standing to assert their right to make abortion decisions free of undue burden by the State of Louisiana.” Id. at 353.
In addressing the question of federal jurisdiction under Article III, the panel, *426 disregarding that the defendants (the Governor and the Attorney General) had caused no injury to the plaintiffs and could never themselves cause any injury under the private civil scheme, nevertheless concluded that, because “[i]t is well established that a claim of direct economic harm visited on abortion providers by a statute is adequate to satisfy the injury-in-fact requirement,” the plaintiffs could assert standing for themselves. Id. at 350. Furthermore, the panel essentially passed over the causation and redressability requirements, stating only:
We are convinced that Article III does not require a plaintiff to plead or prove that a defendant state official has enforced or threatened to enforce a statute in order to meet the case or controversy requirement when that statute is immediately and coercively self-enforcing.
Id. at 349.
The central weakness of the panel’s argument, and the fatal flaw of the dissent’s argument that follows this opinion, is that, notwithstanding that the defendants are powerless to enforce Act 825 against the plaintiffs (or to prevent any threatened injury from its enforcement), the plaintiffs yet must show (1) how these impotent defendants play a causal role in the plaintiffs’ injury and (2) how these defendants can redress their alleged actual or threatened injury. The panel’s reference to the self-enforcing nature of Act 825 is inapposite to the analysis of whether the plaintiffs have any controversy with these defendants. That is to say, the panel confuses the statute’s immediate coercive effect on the plaintiffs witfj any coercive effect that might be applied by the defendants — that is, the Governor and the Attorney General. This confusion allows the panel to state further: “The Plaintiffs’ assertion that they will be forced to discontinue offering legal abortions to patients because of the untenable risks of unlimited civil liability under an unconstitutional Act, sets forth a justiciable case or controversy between the plaintiffs and the Governor and Attorney General of Louisiana.” Id. Once the coercive impact of the statute (coercive in that it exposes plaintiffs to unlimited tort liability by individual plaintiffs) is understood to be distinct from the coercive power of state officials (for example, if the State could institute criminal or civil proceedings under the Act), the panel’s finding of causation here is without a basis. The panel’s own-citation to Lujan recognizes that Article III requires “a causal connection between the injury and the conduct complained of ... ” 504 U.S. at 560-61, 112 S.Ct. 2130 (emphasis added)— that is, here, a connection between the unwarranted monetary judgment (the injury) and the prosecution of a lawsuit under Act 825 by a private civil litigant (the conduct). The plaintiffs have never suggested that any act of the defendants has caused, will cause, or could possibly cause any injury to them. The requirements of Lujan are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute. See Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911) (holding that the United States as defendant had no interest adverse to the claimants); Gritts v. Fisher, 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928 (1912) (finding that the defendant state official was charged with specific duties to enforce the challenged statute and was therefore sufficiently adverse to the plaintiffs to create an Article III controversy).
The plaintiffs also fail to satisfy the “redressability” requirement of the case or controversy analysis. For all practical purposes, the injunction granted by the district court is utterly meaningless.[34] *427 The governor and attorney general have no power to redress the asserted injuries. In fact, under Act 825, no state official has any duty or ability to do anything. The defendants have no authority to prevent a private plaintiff from invoking the statute in a civil suit.[35] Nor do the defendants have any authority under the laws of Louisiana to order what cases the judiciary of Louisiana may hear or not hear. Because these defendants have no powers to redress the injuries alleged, the plaintiffs have no case or controversy with these defendants that will permit them to maintain this action in federal court. See Muskrat, 219 U.S. at 346, 31 S.Ct. 250.[36]
In addressing Article III jurisdiction, the dissent focuses on the injury component of the case or controversy requirement, arguing that this component has been “visibly relaxed” in abortion cases. We do not challenge that the plaintiffs are suffering a threatened injury. We only say that the injury alleged by the plaintiffs is not, and cannot possibly be, caused by the defendants — that is, these defendants will not file and prosecute a cause of action under Act 825 against these plaintiffs; > and that their injury cannot be redressed by these defendants' — 'that is, these defendants cannot prevent purely private litigants from filing and prosecuting a cause of action under Act 825 and cannot prevent the courts of Louisiana from processing and hearing these private tort cases.[37] In this way, the dissent makes much the same argument — and thus incorporates the same fatal flaw — as did the panel opinion. It continues to confuse the coercive impact of the statute itself and the ability — or the absence of ability — of the Governor and Attorney General to cause or redress the impact of the statute on the plaintiffs.
Indeed, the dissent is silent on how the defendants cause the plaintiffs’ alleged injury. The only response the dissent seems to make concerning redressability is that the Governor can provide some relief to physicians sued under Act 825 by “ordering] his agents and subordinates to disregard Act 825 in reviewing civil claims against women’s health care providers and making their legal and factual recommendations as to liability and damages.” This argument is unavailing. First, this response overlooks the elemental fact that a state official cannot be enjoined to act in any way that is beyond his authority to act in the first place. If the defendant Governor or Attorney General has no authority under state law to issue a specific directive, then the plaintiff might as well sue any state officer who, in turn, could direct any other state officer to carry out the injunction orders; or, under the dissent’s reasoning, why not simply order the defendant Governor to decree that no court may entertain any suit brought under Act 825? The dissent, of course, cites no authority *428 for its assertion that the Governor is clothed with power to order the state agencies that administer Title 40 to act in a specified manner with respect to a class of cases. This is not to say that the administrators of Title 40 themselves could not be enjoined to do a particular act that was within their authority — but these plaintiffs must sue those individuals authorized to exercise the orders of the injunction.
Second, the redress sought by the plaintiffs’ complaint is to eliminate the initiation of any and all lawsuits under Act 825— there is nothing in their complaint indicating in any way that plaintiffs seek the limited liability benefits of Title 40 for lawsuits brought under Act 825. Like the entirety of the dissent’s “Title 40” argument, this suggestion makes its first appearance in the dissent that follows this opinion, notwithstanding that this case has been pending for nearly four years. The plaintiffs’ claim is not that Act 825 is constitutional so long as claims brought thereunder are subject to the provisions of Title 40. Indeed, the plaintiffs never mention Title 40, except to say that it is not applicable to any claims brought under Act 825. Their argument is that any cause of action alleged under Act 825 is barred as unconstitutional. Thus, there is no redress for the claimed injury resulting from the application of this unconstitutional statute— that is, the filing and prosecution of a private civil action under Act 825 — that can be provided by these defendants, even under this latest theory of redressability.
Third, we should point out, at the risk of being repetitive, that the matter of causation remains unsatisfied. At best, the Governor only appoints some of the administrators of Title 40, and the Attorney General appoints legal counsel for the Self-Insurance Fund. See La.Rev.Stat. Ann. §§ 39:5(A); 40:1299.44(D); 39:1533(B); 39:1535(B)(6). This appointive power of the defendants inflicts no injury on the plaintiffs. That is to say, it is not the Governor or the Attorney General who inflicts the claimed injury — it is the private plaintiff, bringing a private lawsuit under Act 825, who causes the injury of which the plaintiffs complain.
Thus, even if we take it as true that abortion cases are different from other cases concerning the requirements for injury for Article III purposes, it is in this way — causal connection and redressability — that the dissent’s authorities nevertheless remain lacking.[38] In those cases, where the plaintiffs’ injury may not have been imminent, the defendants had the ability to cause and to redress the plaintiffs’ injuries.[39] Here, that is plainly not *429 the case. Consequently, there is no case or controversy between these plaintiffs and defendants.
We therefore hold that the district court lacked Article III jurisdiction to hear this claim.
VIII
In sum, we hold that the plaintiffs have no case or controversy with these defendants and the district court’s judgment must be dismissed for lack of federal court jurisdiction under Article III of the Constitution. Furthermore, we have made clear in this en banc opinion that the defendants in this case enjoy Eleventh Amendment immunity from this suit and that the Ex parte Young exception to the Eleventh Amendment cannot be applied under these facts. We alternatively hold, therefore, that this suit is barred by the Eleventh Amendment.[40]
The judgment of the district court is
REVERSED, VACATED, and REMANDED for entry of judgment of dismissal.

. Because we find no significant distinction between the positions of Dr. Okpalobi and the intervening clinics and physicians on appeal, we use "plaintiffs” in this opinion to include all intervenors as well as Dr. Okpalobi.

. Act 825 states:
Section 2800.12 Liability for termination of a pregnancy
A. Any person who performs an abortion is liable to the mother of the unborn child for any damage occasioned or precipitated by the abortion, which action survives for a period of three years from the date of the discovery of the damage with a preemptive period of ten years from the date of the abortion.
B. For purposes of this Section:
(1) "Abortion” means the deliberate termination of an intrauterine human pregnancy after fertilization of a female ovum, by any person, including the pregnant woman herself, with an intention other than to produce a live birth or to remove a dead unborn child.
(2) "Damage” includes all special and general damages which are recoverable in an intentional tort, negligence, survival, or wrongful death action for injuries suffered
or damages occasioned by the unborn child or mother.
(3)"Unborn child” means the unborn offspring of human beings from the moment of conception through pregnancy and until termination of the pregnancy.
C.(l) The signing of a consent form by the mother prior to the abortion does not negate this cause of action, but rather reduces the recovery of damages to the extent that the content of the consent form informed the mother of the risk of the type of injuries or loss for which she is seeking to recover. (2) The laws governing medical malpractice or limitations of liability thereof provided in Title 40 of the Louisiana Revised Statutes of 1950 are not applicable to this Section.

.Although the record shows that the Attorney General of Louisiana was named as a party and was served with citation, and although he is named as a party in all of defendants' pleadings, in the injunction orders, and on the notice of appeal, he does not appear as a party on the docket sheet in this court. He nevertheless has invoked the appellate jurisdiction of this court and is a party to this appeal.

. Plaintiffs provide over eighty percent of the abortion services rendered in Louisiana.

. In the district court neither party, nor the district court, raised the question of an Article III case or controversy or the Eleventh Amendment. .

. The Eleventh Amendment states: “The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State.” U.S. Const, amend. XI. The Supreme Court has interpreted the amendment to also constitute a bar on a suit brought against a State by its own citizens in federal court. See Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

. The Supreme Court decided Chisholm on February 14, 1794. Three weeks later, Congress had approved the Eleventh Amendment, and within one year the requisite number of states had ratified the amendment.

. “The States thus retain 'a residuary and inviolable sovereignty.’ They are not relegated to the role of mere provinces or political corporations, but retain the dignity ... of sovereignty.” Id. at 715, 119 S.Ct. 2240 (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)).

. The panel opinion suggests that Smyth stands for the proposition that no special connection is required between a defendant state official and the challenged statute. See Okpa-lobi, 190 F.3d at 344. However, the excerpt from Smyth quoted above clearly indicates that the defendant officers had a duty to enforce the statute in question and seems to undermine the panel's conclusion that Smyth did not involve a "special relationship” between the defendants and the challenged statute. Id.

. The sufficiency of the enforcement power vested in the defendant state officials was never addressed in Smyth. It is clear, however, that the defendants in Smyth possessed enforcement powers not found in the defendants in the case before us. See Smyth, 169 U.S. at 476, 18 S.Ct. 418.

. "It was provided in the act that 'any railroad company, or any officer, agent, or representative thereof, who shall violate any provision of this act, shall be guilty of a felony, and, upon conviction thereof, shall be punished by a fine not exceeding five thousand dollars, or by imprisonment Id. at 128, 28 S.Ct. 441.

. "For this reason the complainants allege that the above-mentioned orders and acts ... denied to the ... railway company and its stockholders ... the equal protection of the *414 laws, and deprived it and them of their property without due process of law ..."Id., at 131, 28 S.Ct. 441.

. The Court also observed:
The question remains whether the attorney general had, by the law of the state, so far as concerns these rate acts, any duty with regard to the enforcement of the same. By his official conduct it seems that he regarded it as a duty connected with his office to compel the company to obey the commodity act, for he commenced proceedings to enforce such obedience immediately after the injunction issued, at the risk of being found guilty of contempt by so doing.
Id. at 160, 28 S.Ct. 441.

. In full, the Court said:
In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.... The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact ...
Id. at 157, 28 S.Ct. 441 (emphasis added).

. We note the dissent's reliance on Justice Harlan's Young dissent in its attempt to show that “it is flatly wrong to assert that Young and Fitts are consistent.” Although dissents may be scholarly and persuasive to some, they are not binding law to any. The dissent’s reliance upon Justice Harlan’s words suggests that they, like Justice Harlan, are simply disenchanted with the fundamental principle articulated in Young.

. See also Dombrowski v. Pfister, 380 U.S. 479, 483, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) ("In Ex parte Young ..., the fountainhead of federal injunctions against state prosecutions, the Court characterized the power and its proper exercise in broad terms: it would be justified where state officers '... threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected [by] an unconstitutional act, violating the Federal Constitution ... ’ ”).

. Our review of the Supreme Court's abortion cases shows that, as the dissent notes, the Court has apparently relaxed certain standing requirements in the abortion context and authorized pre-enforcement challenges to criminal abortion statutes. However, none of these cases suggest, as the dissent intimates, that the requirements of Ex parte Young have in any way been relaxed or vitiated in the abortion context. Indeed, none of the Supreme Court abortion cases expressly address the requirements of Ex Parte Young in the abortion context. This is not surprising in that in all of the abortion cases, unlike the case before us, the defendants had clear capabilities of enforcing the challenged statutes.

. The panel "glean[ed]” this test from Gras v. Stevens, Federal Nat'l Mortgage Ass’n v. Lefkowitz, 383 F.Supp. 1294 (S.D.N.Y.1974), and Allied Artists Pictures Corp. v. Rhodes, 473 F.Supp. 560 (S.D.Ohio 1979), aff'd 679 F.2d 656 (6th Cir.1982).

. The panel relied on the governor's constitutional duty to "faithfully support the constitution and laws of the state,” La. Const art. IV, § 5(A), and the attorney general’s power and right "to institute, prosecute, or intervene in any civil action or proceeding^]” Id., art. IV, § 8. See Okpalobi, 190 F.3d at 346.

. The panel noted the Young Court’s statement that "[t]he doctrine of Smyth v. Ames was neither overruled nor doubted in the Fitts case.” 209 U.S. at 156, 28 S.Ct. 441.

. The Fitts Court specifically recognized this critical difference in distinguishing the facts of Smyth and finding that the defendants in that case were "specially charged with the execution” of the challenged statute. Fitts, 172 U.S. at 529, 19 S.Ct. 269. It would seem that this distinction between Smyth and Fitts, noted by the Supreme Court, calls into question the panel's understanding of Smyth as support for its interpretation of Young as imposing a lesser legal standard than Fitts.

. The statute challenged in Smyth authorized not only private suits for overcharges, but also enumerated a system of substantial and escalating fines to be paid to the state. See 169 U.S. at 517, 18 S.Ct. 418. Thus, the statute involved liability to the state in addition to private contractual liability. A system of fines implies an enforcement power in the state.

. The immediately following sentence, in the same paragraph, reads:
The being specially charged with the duty to enforce the statute is sufficiently apparent when such duty exists under the general authority of some law, even though such authority is not to be found in the particular act. It might exist by some reason of the general duties of the officer to enforce it as a law of the state.
This use in Young of the "specially charged” language from Fitts reinforces the holding in Fitts and clearly suggests that the court did not intend the “some connection” to be without authority to enforce the statute.

. We note especially the Young Court’s adoption of the "special charge” language from Fitts: "The being specially charged with the duty to enforce the statute is sufficiently *419 apparent when such duty exists under the general authority of some law ...” Young, 209 U.S. at 158, 28 S.Ct. 441.

. This conclusion is essentially the one reached by Judge Friendly in Gras:
The argument would continue that although Fitts v. McGhee held that the bar of the Eleventh Amendment could not be avoided by suing state officers in the absence of "any special relation” on their part "to the particular statute alleged to be unconstitutional,” this was altered by the statement in Ex parte Young [regarding “some connection”]. In our view this would extend Ex parte Young beyond anything which the Supreme Court intended or has subsequently held.... [W]e know of no case in which the general duty of a governor to enforce state laws has been held sufficient to make him a proper party defendant in a civil rights action attacking the constitutionality of a state statute concerning ... private civil actions.
415 F.Supp. at 1152.

. Allied Artists states:
Thus the problem now before the Court becomes that of properly placing this case on the continuum. Defendants would argue that since the Act purports to regulate contractual rights between private parties, namely motion picture distributors and exhibitors, there is no realistic potential that the defendant governor would act to enforce the statutory rights which could be vindicated by private action. Plaintiffs on the other hand would claim that the alleged substantial and immediate impact upon them of the Act is tantamount to direct state regulation which could reasonably require *420 the governor’s attention under his general duty to see to the faithful execution of the laws.... I believe it can be reasonably maintained that the Act amounts to state regulation of movie producers and distributors doing business in Ohio. Presumably, then, this exercise of the state’s regulatory power is designed to implement and serve the public interest of Ohio. The Court is aware that there is no criminal sanction attached to the Act, and also that plaintiffs could possibly await a dispute with an exhibitor and sue, raising there the question of the Act's constitutionality. However, that begs the question in the case at bar. The pertinent question is: does the governor of Ohio, as the chief executive of the state, have an interest in the enforcement of the Act? Or, on the other hand, is this simply an Act near the Gras end of the continuum where the public interest is not crucial, the dispute is such that the governor’s interest is absent, and the matter can be adequately decided in an action between concerned private parties? The question is difficult; the real thrust of the Act is somewhat obscure on its face. However, in ruling on this motion to dismiss, the Court must view the complaint most favorably for plaintiffs. Thus, in the exercise of great caution ... I hold that plaintiffs have alleged facts sufficient to invoke the Young fiction and to avoid the Eleventh Amendment bar.
473 F.Supp. at 569. Of course, presumably every statute is designed to serve the public interest in some way or another. More importantly, the placement of this statute on the “public” side of the continuum seems not to have been much of a weighed decision at all, given the obvious deference to the plaintiff’s argument in a Rule 12(b)(6) motion. Allied Artists is, however, the sum total of the panel’s support for its adoption of a "continuum” prong and its placement of Act 825 on the "public” side of the continuum.

. None of the plaintiff-appellees appear willing to rely on the dissent's theory. Indeed, the appellees expressly observe in their briefs that the medical malpractice scheme does not apply to any cause of action under Act 825.

. The dissent asserts that “[ujnder Title 40’s medical malpractice system, all malpractice claims against private and public health care providers must be reviewed by a medical review panel before the claimant can file suit in court.” (emphasis added).

. The dissent incorrectly observes that Act 825 "remov[es] abortion doctors from the umbrella of medical malpractice protections.” Act 825 does not exempt abortion doctors from the provisions of Title 40. Rather, all claims brought pursuant to Act 825 are exempt from Title 40. It is upon this initial flawed foundation that the entirety of the dissent’s argument is constructed.

. See, e.g., Causeway Med. Suite v. Foster, 221 F.3d 811 (5th Cir.2000), aff’g, Causeway Med. Suite v. Foster, 43 F.Supp.2d 604, 609 (E.D.La.1999); Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 909, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); Colautti v. Franklin, 439 U.S. 379, 381, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 83-84, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Karlin v. Foust, 188 F.3d 446, 456 (7th Cir.1999); Women's Medical Prof'l Corp. v. Voinovich, 130 F.3d 187, 191 (6th Cir.1997); Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1454 (8th Cir.1995).

. We also briefly respond to Judge Bena-vides’ concurring and dissenting opinion. We understand that opinion to suggest that we should "pragmatically” apply Ex Parte Young in a declaratory judgment action, without regard to the fact that no case has ever rejected the Young fiction as the only means of avoiding the Eleventh Amendment; that we should assume that the Eleventh Amendment makes an exception for the Declaratory Judgment Act for any case that seeks to enforce a federal right denied by the state, when this position has never been held by any court; that we should find no Article III controversy in this case as to the injunction, and, then turn and find a controversy on the same set of facts, including the same parties, alleging the same claim and seeking the same resolution via a declaratory judgment; and that we should assume that the Declaratory Judgment Act provides an independent cause of action, notwithstanding that the law makes clear that— although the Declaratory Judgment Act provides a remedy different from an injunction— it does not provide an additional cause of action with respect to the underlying claim. See Earnest v. Lowentritt, 690 F.2d 1198, 1203 (5th Cir.1982). Neither case law or the Constitution allows for this creative analysis.
The opinion makes the novel and cryptic contention that "the Supreme Court’s modern standing doctrine has subsumed the connection inquiry [of Young ].” The revelation that the connection inquiry of Young is no longer applicable law would come as a surprise to the numerous federal courts that continue to apply this connection inquiry as the binding law of the land. See, e.g., Lytle v. Griffith, 240 F.3d 404 (4th Cir.2001); Confederated Tribes & Bands of the Yakama Indian Nation v. Locke, 176 F.3d 467 (9th Cir.1999); Snoeck v. Brussa, 153 F.3d 984 (9th Cir.1998); Luckey v. Harris, 860 F.2d 1012 (11th Cir.1988); Finberg v. Sullivan, 634 F.2d 50 (3d Cir.1980); Shell Oil Co. v. Noel, 608 F.2d 208 (1st Cir.1979). That the doctrine of standing has "subsumed” the connection inquiry under Young would likely surprise the Supreme Court itself, which has never questioned the continuing viability of Young and, indeed, has recently reaffirmed the vitality of the doctrine. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 262, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). We note that the Supreme Court has frequently emphasized its unwillingness to recognize the overruling of its precedent by implication. See Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (“We do not acknowledge, and we do not hold, that other courts should conclude our more recent «cases have, by implication, overruled an earlier precedent. We reaffirm that if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this *424 Court the prerogative of overruling its own decisions.”) (citation omitted).
This opinion effectively asks us to jettison the traditional connection inquiry outlined in Young and hold that the state qua state may be sued in federal court when the plaintiff, in a declaratory judgment action, seeks to assert federal constitutional rights against the state because the Fourteenth Amendment trumps the Eleventh Amendment. To borrow the concurring and dissenting opinion’s words: "That [is] beyond the power of this intermediate court.”

. We are at a loss to grasp what drives Judge Higginbotham’s concurring opinion, in which he states that our effort to resolve the crucial Eleventh Amendment question in this case "should not have been undertaken.” Despite its opposition, the concurring opinion in no way hints at where our treatment of Ex parte Young runs astray of the established law and does not deny that the issue has been central to both the panel opinion and these en banc proceedings.
Indeed, the opinion seems to ignore the prominence, not to mention the importance, of that issue in this case and the purpose of the en banc court. The panel opinion based its holding on Young. This court voted for en banc to consider the Eleventh Amendment issues that the parties and the panel had raised. The State has vigorously asserted its Eleventh Amendment immunity in both its petition for rehearing and in its en banc briefs. The plaintiff-appellees addressed the Young issue before this en banc court as well. Therefore, once this case reached the full court, the State was forcefully claiming its Eleventh Amendment immunity, and the plaintiffTappellees were vigorously arguing the Young exception. The purpose of the en banc court is to clarify the law when a "panel decision conflicts with a decision of the United States Supreme Court” or the case “involves one or more questions of exceptional importance”. Fed. R.App. P. 35(b)(1). Under the circumstances of this case, it would be difficult, if not irresponsible, to remain silent on the panel’s and the dissent’s misreading of the Young exception.

. In Calderon, the Ninth Circuit had rejected the defendant state officers' Eleventh Amendment defense and affirmed a declaratory judgment regarding a portion of the Antiterrorism and Effective Death Penalty Act of 1996. The Supreme Court, which had granted certiorari on the court’s rejection of the defendants’ Eleventh Amendment defense, passed the opportunity to address the question of Eleventh Amendment immunity, and decided the case based on Article III standing.
Whether the Supreme Court would come to the same conclusion were it faced with the case before us, where the issue on appeal is the propriety of an injunction rather than a judgment under the Declaratory Judgment Act, is surely open to question. We note that the authority cited by the Calderon court for first addressing standing does not support the proposition that courts must always address standing before considering the Eleventh Amendment.
The Court first relied on Patsy v. Board of Regents of Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). In Patsy, the Court decided not to address the Eleventh Amendment issue in part because the State had expressly requested that the Court address the substance of the claim. See Id. at 515, 102 S.Ct. 2557. It is relevant to our case to note, however, that one of the reasons the Court decided to look past the Eleventh Amendment and to address the merits of the exhaustion claim was that the exhaustion issue was “decided below and vigorously pressed in this Court.” Id. Here, too, have the State of Louisiana and the plaintiff-appel-lees "vigorously pressed” the Eleventh Amendment issue before this en banc court.
Second, the Calderon court relied on Idaho v. Coeur d’Alene Tribe of Idaho, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), in deciding to address Article III jurisdiction before the Eleventh Amendment. Although Coeur d’Alene holds that "a State can waive its Eleventh Amendment protection”, that *425 case does not suggest that the Eleventh Amendment is anything less than an actual restriction on the Article III jurisdiction of the federal courts. See Id. at 270, 117 S.Ct. 2028 (noting that “Eleventh Amendment immunity represents a real limitation on a federal court’s federal-question jurisdiction.”).
Finally, it must be recognized that, on several other occasions, the Supreme Court has not addressed the standing issue prior to addressing the Eleventh Amendment, despite the fact that standing was an issue in these cases. See, e.g., Seminole Tribe of Florida v. Florida, 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); Edelman v. Jordan, 415 U.S. 651, 658-59, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Indeed, the Supreme Court has stated in unequivocal words that “the Eleventh Amendment [stands] for the constitutional principle that state sovereign immunity limit[s] the federal courts’ jurisdiction under Article III.” Seminole Tribe, 517 U.S. at 64, 116 S.Ct. 1114; See also Coeur d’Alene, 521 U.S. at 270, 117 S.Ct. 2028.

. The district court enjoined the statute. An injunction enjoins a defendant, not a statute. The dissent does not suggest to us the wording of the proposed injunction against these defendants that it would enter to bar either private plaintiffs from suing under the statute or courts from hearing such suits.

.The dissent cites Causeway Medical Suite v. Ieyoub, 109 F.3d 1096 (5th Cir.1997), for the proposition that these plaintiffs have a case or controversy against the Governor and Attorney General in this case. In Causeway, however, two additional named defendants (the Secretary of the Department of Health and Hospitals and the Secretary of the Department of Social Services) appear to have possessed some enforcement connection with the challenged statute. See id. at 1100-01. The opinion, however, does not analyze in any detail the case or controversy issue, and the precise role that each defendant played in enforcing the statute in question is not clear. See id. at 1102. To the extent, however, that Causeway might stand for the proposition that the defendants need have no causal connection to the plaintiff’s injury and powers to redress the injury in order to create an Article III case or controversy, that case is overruled.

. The cases cited by the dissent that purport to authorize standing under these facts are hardly persuasive in deciding the jurisdiction of the federal courts in the case before us. In each of those cases, a case or controversy existed between the plaintiffs and defendants because of the presence of criminal liability provisions, fully enforceable by the state officials who were sued. There is no such basis here that would provide an Article III home.

. The cases cited by the dissent to support this relaxation of the injury requirement do not in any way minimize the necessity of causation and redressability to establish an Article III case or controversy.

. The dissent cites Mobil Oil Corp. v. Attorney General, 940 F.2d 73 (4th Cir.1991), as support for its claim that causation and re-dressability can exist even where a challenged statute provides only a private tort cause of action. The court in Mobil Oil did indeed find a controversy between the plaintiff and the Attorney General of Virginia in that case. However, that controversy was founded upon the Attorney General's explicit statutory authority, as granted via the challenged act itself, to "investigate and bring an action in the name of the Commonwealth to enjoin any violation of [the statute].” Va.Code § 59.1-68.2. This authority — granting the defendants some sort of enforcement power against the plaintiffs so as to create a case or controversy under Article III — simply does not exist in the case before us. The dissent’s interpretation of Mobil Oil as saying that this express statutory authority, non-existent in the case before us, was "irrelevant” to a finding of controversy between the plaintiff and Attorney General is plainly wrong.

. The dissent cites Corporate Health Insurance, Inc. v. Texas Department of Insurance, 215 F.3d 526 (5th Cir.2000), for the proposition that the medical malpractice scheme alone gives the Governor and Attorney General sufficient powers of causation and redress-ability with regard to Act 825, notwithstanding the fact that Act 825 provides only a private cause of action. The citation of Corporate Health for this proposition seems to us seriously mistaken. The dissent ignores the following language that makes it clear that a case or controversy in that case was founded upon the authority of the Attorney General to specifically enforce the statute at issue:
Aetna replies that it has standing because the liability provisions expose it not only to private suits but also to the regulatory *429 reach of the Attorney General. We agree. This is not a case in which private suits are the only means of enforcing a challenged statutory standard. The Attorney General can pursue Aetna through an action under the Texas Deceptive Trade Practices Act and the Insurance Code. This regulatory oversight [the right of the Attorney General to sue directly] is sufficient to create the requisite imminent injury' for standing.
Id. at 532 (emphasis added).

. It is important to keep in mind that anyone exposed to actual liability under this statute has immediate redress — that is to say, a defendant sued by a private plaintiff under Act 825 can immediately and forthwith challenge the constitutionality of the statute. The opinions that follow, although surely recognizing this fact, seem to fall prey to the fallacy that, failing the success of this particular challenge to Act 825, an allegedly unconstitutional statute will remain on the books in Louisiana in perpetuity. That is plainly not the case. Once any private plaintiff seeks to enforce her rights under the statute, Act 825, if indeed unconstitutional, will be stricken forever from the statute books of Louisiana. See La.Code Civ. Proc. Ann. art. 1871 (West 1999); Perschall v. State of Louisiana, 697 So.2d 240, 254 (La.1997) (holding that the declaratory judg-menl action by plaintiff, a registered voter in the state, against the State as the party defendant was justiciable because the plaintiffs interests and "the State's duty to uphold the act” were sufficiently adverse). We note that the Eleventh Amendment is no bar to the United Stales Supreme Court's consideration of a case against state officers brought to it by way of state courts. See South Cent. Bell Tel. Co. v. Alabama, 526 U.S. 160, 166, 119 S.Ct. 1180, 143 L.Ed.2d 258 (1999).