SUMMIT MEDICAL CENTER OF ALABAMA, INC., New Women's Health Care; Beacon Women's Center; on behalf of themselves and their patients seeking abortions, Plaintiffs,

v.

Bob RILEY, in his official capacity as Governor for the State of Alabama and his agents and successors; Bill Pryor, in his official capacity as Attorney General for the State of Alabama and his agents and successors; Donald Williamson, M.D., in his official capacity as State Health Officer for the Alabama Department of Public Health and his agents and successors; and Ellen Brooks, in her official capacity as Montgomery District Attorney, Defendants.

No. CIV.A.02–A–1064–N.

United States District Court,
M.D. Alabama,
Northern Division.

July 25, 2003.

M. Wayne Sabel, Sabel & Sabel, P. C., Montgomery, AL, David A. Gespass, Gespass & Johnson, Birmingham, AL, Linda A. Rosenthal, Angela Hooton, Center for Reproductive Rights, New York City, for Plaintiffs.

William H. Pryor, Jr., Attorney General, Charles B. Campbell, Office of the Attorney General, Montgomery, AL, A. Eric Johnston, Birmingham, AL, Patricia E. Ivie, John R. Wible, Alabama Department of Public Health, Troy R. King, Office of the Governor, Montgomery, AL, William D. Dill, Office of the Attorney General, Troy R. King, Office of the Governor, Montgomery, AL, for Defendants.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This case is before the court on the Plaintiffs' Motion for Partial Summary Judgment (Doc. # 69), and the Defendants' Motion for Partial Summary Judgment and to Dismiss (Doc # 71).

The Plaintiffs, a group of health care facilities which provide abortion services in the State of Alabama, filed a Class Action Complaint on September 17, 2002, challenging, on behalf of themselves and their patients seeking abortions, the constitutionality of The Woman's Right to Know Act ("Act"). *See Ala.Code* §§ 26–23A–1 to 13 (Supp.2002). The Defendants include the Governor of the State of Alabama, the Attorney General, the State Health Officer, and the Montgomery District Attorney.[1] The Plaintiffs request that the court enjoin the Defendants from enforcing the Act and to issue a declaration that the Act is unconstitutional.

In addition to their Complaint, the Plaintiffs also filed a Motion for Temporary Restraining Order/Preliminary Injunction (Doc. # 2) to prevent the Act from taking effect on October 14, 2002. The court held a hearing on the Plaintiffs' motion on September 26–27, 2002. Following the hearing, the court issued a Memorandum Opinion (Doc. # 18) and accompanying Order and Preliminary Injunction (Doc. # 19) on September 30, 2002. *See Summit Med. Ctr. v. Siegelman,* 227 F.Supp.2d 1194 (M.D.Ala.2002). In the Order, the court granted the Motion for Preliminary Injunction in part and denied it in part. The Plaintiffs subsequently filed a Motion for Clarification (Doc. # 21) on October 4, 2002. In response, the court issued an Amendment to Order and Preliminary Injunction on October 14, 2002 (Doc. # 25).

On February 25, 2003, the Plaintiffs filed an Amended Class Action Complaint raising eleven claims for relief (Doc. # 51). The Defendants filed an Answer on March 10, 2003 (Doc. # 53). On April 9, 2003, the Plaintiffs filed a Notice of Dismissal (Doc. # 67) with respect to the following named Plaintiffs in the Amended Complaint: 1) Reproductive Health Services; 2) West Alabama Women's Center; 3) Center for Choice; 4) Dr. Richard Stuntz, M.D.; and 5) Dr. Louis T. Payne, M.D. The court subsequently treated the Plaintiffs' notice as a Motion to Dismiss and dismissed the

---

1. Although the Plaintiffs' Class Action Complaint seeks to certify a defendant class comprised of the District Attorneys in the State of Alabama who are responsible for enforcing the Act, the parties have stipulated that class certification is unnecessary at this time, and no class has been certified. This stipulation is based on representations that the Attorney General has directed the State's District Attorneys to comply with this court's orders. The parties also agree that the stipulation should not prejudice the Plaintiffs' ability to seek class certification at a later date, or the Defendants' ability to object to class certification. *See* Joint Stipulation (Doc. # 38).

foregoing Plaintiffs with prejudice (Doc. # 87).[2]

The Plaintiffs and Defendants filed cross motions for partial summary judgment on April 15 and 16, 2003, respectively. The court heard oral argument on the motions on July 3, 2003.

For the reasons to be discussed, the Plaintiffs' Motion for Partial Summary Judgment (Doc. # 69) is due to be GRANTED in part and DENIED in part, and the Defendants' Motion for Partial Summary Judgment and to Dismiss (Doc # 71) is due to be GRANTED in part and DENIED in part.

## II. *SUMMARY JUDGMENT STANDARD*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. *THE WOMAN'S RIGHT TO KNOW ACT*

The State of Alabama adopted The Woman's Right to Know Act ("Act") on April 17, 2002. *See Ala.Code* §§ 26–23A–1 to 13. Its purpose is "to ensure that every woman considering an abortion receives complete information on the procedure, risks, and her alternatives." *Id.* at § 26–23A–2(b). In similarity to statutes passed by an increasing number of states, the Act is an "informed consent" statute by which providers of abortions are required to provide a woman seeking an abortion with: 1)

---

**2.** Three named Plaintiffs currently remain in the litigation: 1) Summit Medical Center of Alabama, Inc.; 2) New Women's Health Care; and 3) Beacon Women's Center.

a designated set of printed informational materials at least twenty-four hours prior to an abortion procedure, either in person or by certified mail; and 2) additional information regarding the specific characteristics of the woman's abortion in person at any point prior to the procedure. *Id.* at §§ 26–23A–4(a), (b). Additionally, "the woman shall complete and sign a form that she has received" both the printed and in-person information, "and does provide her informed consent for an abortion on her unborn child." *Id.* at § 26–23A–(4)(c).

Currently, only two provisions of the Act are in dispute between the parties. First, the Plaintiffs contend that the Act's mandatory payment and distribution provisions, §§ 26–23A–4(a), 5(c), violate their First Amendment rights because it requires them to purchase and distribute speech they find ideologically objectionable. *See* Complaint, ¶ 99. Second, the Plaintiffs argue that the Act's civil liability provision, § 26–23A–10(a), violates the Due Process Clause of the Fourteenth Amendment because it creates "prima facie presumptions of liability for offenses such as parental and judicial consent completely unrelated to the scope of the Act's provisions." *Id.* at ¶ 101. The specific language of these two provisions is as follows.

A. *Mandatory Distribution and Payment Provisions*

The Act requires the Alabama Department of Public Health ("ADPH") to create an informational brochure containing the following information:

(1) Geographically indexed printed materials designed to inform the woman of public and private agencies and services available to provide medical and financial assistance to a woman through pregnancy, prenatal care, upon childbirth, and while her child is dependent. The materials shall include a comprehensive list of the agencies, a description of the services offered, and the telephone numbers and addresses of the agencies.

(2) The printed materials shall include a list of adoption agencies geographically indexed and that the law permits adoptive parents to pay the cost of prenatal care, childbirth and neonatal care.

(3) Printed materials that inform the pregnant woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from fertilization to full term. It shall include color photographs of the developing child at each of the two-week gestational increments, a clear description of the unborn child's development, any relevant information on the possibility of the unborn child's survival, and dimensions of the unborn child. The materials shall be realistic, clear, objective, non-judgmental, and designed to convey only accurate scientific information about the unborn child at the various gestational ages.

(4) The materials shall contain objective information describing the methods of abortion procedures commonly employed and the medical risks of each, and the medical risks associated with carrying a child to term.

(5) The printed materials shall list the support obligations of the father of a child who is born alive.

(6) The printed materials shall state that it is unlawful for any individual to coerce a woman to undergo an abortion, that any physician who performs an abortion upon a woman without her informed consent may be liable to her for damages in a civil action at law.

(7) The material shall include the following statement: "There are many public and private agencies willing and able to help you to carry your child to term, and to assist you and your child after your child is born, whether you choose to keep your child or place him or her for

adoption. The State of Alabama strongly urges you to contact those agencies before making a final decision about abortion. The law requires that your physician or his or her agent give you the opportunity to call agencies like these before you undergo an abortion." *Id.* at § 26–23A–5(a). These materials "shall be in a bound booklet, shall contain large clear photographs, and shall be printed in a typeface large enough to be clearly legible." *Id.* at § 26–23A–5(b). Under the Act, a physician or qualified person[3] must provide a copy of this information booklet to the woman at least 24 hours prior to the abortion procedure. *Id.* at § 26–23A–4(a).

In addition to the information booklet, the Act requires ADPH to create a video tape detailing much of the information in the printed materials as well as a consent form in order for the patient to verify that she gives informed consent pursuant to the Act. *Id.* at §§ 26–23A–(6)(a), (c). Unlike the mandatory printed materials, however, the Act does not require patients to view the video tape if they do not want to do so. *See id.* at §§ 26–23A–4(b)(5), 4(d) (stating that a woman gives informed consent if she acknowledges on the consent form that she had the opportunity to view the video tape).

The Act states that ADPH "may charge a reasonable fee based on the cost of producing the materials and video tape." *Id.* at § 26–23A–(5)(c). According to a letter dated September 18, 2002, ADPH informed the Plaintiffs that the printed information packages may be purchased at a cost of $4.00 each, plus $6.00 shipping and handling. *See* Memorandum in Support of Plaintiffs' Motion for Summary Judgment (Doc. # 70), Exhibit B. As a service to large volume consumers, however, ADPH stated that it will waive the shipping and handling fees on orders that are received between certain specified dates each year.[4] ADPH also intends to charge the Plaintiffs $50 for each copy of the video tape.

**B.** *Civil Liability Provision*

The Act's civil liability provision states the following:

In addition to whatever remedies are available under the common or statutory law of this state, failure to comply with the requirements of [the Act] shall:

(a) Provide a basis for a civil action for compensatory and punitive damages. Any conviction under this chapter shall be admissible in a civil suit as prima facie evidence of a failure to obtain an informed consent or parental or judicial consent. The civil action may be based on a claim that the act was a result of simple negligence, gross negligence, wantonness, willfulness, intention, or other legal standard of care.

*Id.* at § 26–23A–10(a).[5]

## IV. *DISCUSSION*

The Plaintiffs' Amended Class Action Complaint alleges that the Woman's Right

---

**3.** The Act defines a "qualified person" as "[a]n agent of the physician who is a psychologist, licensed social worker, licensed professional counselor, registered nurse, or physician." *Id.* at § 26–23A–3(9).

**4.** ADPH will waive the shipping and handing fees on orders received between the following dates: March 1–15, June 1–15, September 1–15, and December 1–15.

**5.** Section 10 of the Act also creates a "basis for professional disciplinary action under any

applicable statutory or regulatory procedure for the suspension or revocation of any license for physicians, psychologists, licensed social workers, licensed professional counselors, registered nurses, or other licensed or regulated persons." *Id.* at § 26–23A–10(b). Additionally, it permits a woman to recover "for the wrongful death of the child, whether or not the unborn child was viable at the time the abortion was performed or was born alive." *Id.* at § 26–23A–10(c). The Plaintiffs

to Know Act violates the United States Constitution in eleven different respects. A brief summary of these claims is as follows:

1) First Claim: "The Act violates the right of privacy ... guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution, in that its *purpose* is to place a substantial obstacle in the path of women seeking pre-viability abortions." Amended Class Action Complaint, ¶ 82 (emphasis added).

2) Second Claim: "The Act violates the right of privacy ... guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution, in that its *effect* is to place a substantial obstacle in the path of women seeking pre-viability abortions." *Id.* at ¶ 84 (emphasis added).

3) Third Claim: "The Act violates the right of informational privacy guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution, in that the Act's two-trip requirement will force some women to disclose their decision to terminate their pregnancy to ... third parties." *Id.* at ¶ 85.

4) Fourth Claim: "The Act violates the right of informational privacy guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution, in that the Act's mailing requirement will disclose a woman's decision to terminate a pregnancy to ... third parties." *Id.* at ¶ 87.

5) Fifth Claim: "The Act violates the Plaintiffs' right to privacy and due process guaranteed by the Fourteenth Amendment ... because its requirement that a woman come in person to a physician's office to obtain state-mandated information 24–hours prior to an abortion procedure or obtain information via ...

certified mail is irrational and unsupported by any state interest." *Id.* at ¶ 89.

6) Sixth Claim: "The Act violates the Plaintiffs' rights to privacy and due process guaranteed by the Fourteenth Amendment ... by failing to contain a constitutionally adequate medical emergency exception." *Id.* at ¶ 91.

7) Seventh Claim: "The Act violates the Plaintiffs' rights to privacy and due process guaranteed by the Fourteenth Amendment ... by purporting to establish fetal viability at 19 weeks and imposing unconstitutional requirements upon physicians whenever a fetus has reach 19 weeks gestation." *Id.* at ¶ 93.

8) Eighth Claim: "The Act violates the Plaintiffs' rights to privacy and confidentiality guaranteed by the Fourteenth Amendments [sic] ... by permitting public officials to disclose an abortion patient's identity without her consent." *Id.* at ¶ 95.

9) Ninth Claim: "The Act violates women's right [sic] to equal protection of law guaranteed by the Fourteenth Amendment ... because [it imposes] restrictions on a medical procedure sought only by women." *Id.* at ¶ 97.

10) Tenth Claim: "The Act violates Plaintiffs' First Amendment rights by forcing them to pay money for mandatory speech they do not wish to endorse let alone purchase." *Id.* at ¶ 99.

11) Eleventh Claim: "The Act violates Plaintiffs' procedural due process [rights] as the Act creates prima facie presumptions of liability for offenses such as parental and judicial consent completely unrelated to the scope of the Act's provisions." *Id.* at ¶ 101.

The Defendants have moved for summary judgment or partial summary judgment

have not challenged either of these two provisions.

ment on each of these claims. The Plaintiffs oppose the Defendants' summary judgment motion only with respect to the Tenth and Eleventh Claims. In addition, the Plaintiffs have filed a cross motion for summary judgment on their Tenth and Eleventh Claims. *See* Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment, p. 1 (Doc. # 70). Because the Plaintiffs admit that they "are no longer pursuing" their First, Third, Fourth, Fifth, and Ninth Claims, summary judgment is due to be GRANTED in favor of the Defendants on these claims. *See* Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment & To Dismiss, p. 1 n. 1 (Doc. # 85). As to the Plaintiffs' Second, Sixth, Seventh, and Eighth Claims, the parties have agreed that summary judgment is not appropriate; thus, the court need not address these claims. Consequently, the only remaining claims in dispute between the parties are the Plaintiffs' Tenth and Eleventh Claims. The court will address each of these claims separately.

### A. Tenth Claim: Compelled Distribution and Payment Provisions

The Plaintiffs' Tenth Claim alleges that the Act violates the First Amendment because it requires abortion providers "to pay money for mandatory speech they do not wish to endorse let alone purchase." Complaint, ¶ 99. Under the Act, a physician or qualified person must provide a woman with a copy of the State's information booklet at least 24 hours prior to the abortion procedure. *See Ala.Code* § 26–23A–4(a). Additionally, § 26–23A–5(c) of the Act authorizes the Alabama Department of Public Health to "charge a reasonable fee based on the cost of producing the materials and video tape." The Plaintiffs argue that these two sections of the Act collectively violate the First Amendment's prohibition against compelled speech because they force the Plaintiffs to distribute

and pay for informational materials that further the State's ideological viewpoint.

In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court considered a statute that required providers of abortions to inform their patients of the availability of state-produced materials favoring childbirth over abortion and to provide the materials to any patient wishing to receive them. The materials were to be furnished by the State without charge. The petitioners argued that Pennsylvania's informed consent statute violated the First Amendment because it required physicians to disseminate state-produced information materials about abortion that the physicians found ideologically unacceptable. *See Casey*, 505 U.S. at 884, 112 S.Ct. 2791. The Supreme Court rejected this contention in a single paragraph of discussion:

> All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion and childbirth, in a manner mandated by the State. To be sure, the physician's First Amendment rights not to speak are implicated, *see Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State, *cf. Whalen v. Roe*, 429 U.S. 589, 603, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.

*Id.* at 884, 112 S.Ct. 2791. Although *Casey* disposed of the First Amendment argument in brief fashion, the Court's decision offers two critical insights that serve as a useful starting point for the present discussion. First, a statute that does not require physicians to pay for state-au-

thored informational materials, but only requires physicians to inform a woman about the availability of the materials, and provide these materials to her should she choose to see them, does not violate the First Amendment. *See Casey,* 505 U.S. at 908, 112 S.Ct. 2791 (Appendix to Opinion of O'Conner, Kennedy, Souter, JJ.) (quoting 18 *Pa. Cons.Stat.* § 3205(a)(3),(4) (1990) (stating that in order to have informed consent, a woman must certify in writing that a "copy of the printed materials has been provided to the woman if she chooses to view these materials.")). Second, the fact that state-authored information expresses a preference for childbirth over abortion is irrelevant to the First Amendment analysis. This conclusion is based on *Casey*'s explicit recognition that the "State may enact rules and regulations designed to encourage [a woman] to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself." *Id.* at 872, 112 S.Ct. 2791. In other words, "[t]he Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth." *Id.* (internal quotations and citations omitted). The Supreme Court's First Amendment decision in *Casey* expressly rejected the notion that a state may require distribution only of ideologically neutral information regarding abortion—that is, information that not only is truthful and not misleading, but also that does not express a preference in favor of either childbirth or abortion, because Pennsylvania's challenged informational

materials did express a preference for childbirth over abortion. *See id.* at 883, 112 S.Ct. 2791 ("[W]e permit a State to further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed, even when in so doing the State expresses a preference for childbirth over abortion. In short, requiring that the woman be informed of the availability of information relating to fetal development and the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion.").

Although *Casey*'s First Amendment discussion provides some guidance, it does not squarely resolve the issue presented in this case because the Act differs from Pennsylvania's informed consent statute in two important respects. First, under the Act, physicians are required to purchase the State's informational materials. *Compare Casey,* 505 U.S. at 908, 112 S.Ct. 2791 (Appendix to Opinion of O'Conner, Kennedy, Souter, JJ.) (quoting 18 *Pa. Cons.Stat.* § 3208(c) (1990) ("The materials required under this section shall be available at no cost from the department upon request and in appropriate number to any person, facility or hospital.")), *with Ala.Code* § 26–23A–5(c) ("The department may charge a reasonable fee based on the cost of producing the materials and video tape.").[6] Second, the Act requires physicians to provide a woman with a copy of the State's information booklet regardless of whether the woman requests it or consents to receive it. *Compare Casey,* 505 U.S. at 908, 112 S.Ct. 2791 (Appendix to Opinion of O'Conner, Kennedy, Souter, JJ.) (quoting 18 *Pa.*

---

**6.** Although the Act states that the Department *"may* charge" for the informational materials, ADPH has written a letter to all abortion providers indicating that it intends to charge

a fee for both the booklet and video tape. *See* Memorandum in Support of Plaintiffs' Motion for Summary Judgment (Doc. # 70), Exhibit B.

*Cons.Stat.* § 3205(a)(3)-(4) (1990) (stating that a woman must certify in writing that "a copy of the printed materials has been provided to the woman if she chooses to view these materials.")), *with Ala.Code* § 26–23A–5(d) (stating that the woman must sign a consent forming indicating that "she has received" the print materials). The Plaintiffs argue that the inclusion of these two provisions distinguishes the Act from the statute upheld in *Casey;* thus, they conclude that the combination of the compelled distribution and payment requirements violates the First Amendment.

### Distribution

■ With respect to the Act's compelled distribution requirement, the court finds that *Casey* resolves the issue. The Plaintiffs contend that the compelled distribution provision violates the First Amendment rights of the abortion providers because it requires them to distribute materials and information promoting childbirth over abortion, which they find ideologically objectionable. *See* Plaintiffs' Memorandum In Support of Plaintiffs' Motion for Summary Judgment, Exhibits (C)-(E) (citing the statements of abortion clinic employees who disagree with the information contained in the State's materials).[7] When the argument is framed in this fashion, the court concludes that the differences between the Act and Pennsylvania's informed consent statute are immaterial. This conclusion is based on the fact that both the Act and the Pennsylvania statute upheld in *Casey* require abortion providers to distribute speech they find objectionable. Neither statute restrains the provider from expressing to the patient personal opinions in opposition

to any statement contained in the materials. The only difference between the two statutes is that the Act requires physicians to distribute the information to all women seeking an abortion, whereas Pennsylvania's statute merely requires actual distribution to women who want to see the information. From the perspective of the *abortion providers'* First Amendment rights, however, this difference is irrelevant because under either scheme abortion providers are ultimately required to deliver speech they find ideologically objectionable. If the Supreme Court had believed that such a distribution requirement violated the First Amendment rights of the abortion providers in *Casey*, this court has no doubt that it would have declared the compelled distribution portion of Pennsylvania's informed statute unconstitutional. Because the Supreme Court did not reach this conclusion, this court similarly declines to hold that the Act's compelled distribution provision, § 26–23A–4(a), violates the First Amendment rights of the abortion providers in this case. *See Karlin v. Foust,* 975 F.Supp. 1177, 1226 (W.D.Wis.1997), *aff'd in part, rev'd in part,* 188 F.3d 446 (7th Cir.1999) (holding that a provision in Wisconsin's informed consent statute does not violate the First Amendment even though it requires "abortion providers to physically give the state-printed materials to their patients" without their consent, citing *Casey* ).[8]

■ To the extent that the Plaintiffs argue that a woman's First Amendment rights are violated by the compelled distribution provision because it requires her to receive state-authored information that she finds objectionable, the court finds that a woman's First Amendment rights

---

7. Contrary to the Defendants' position, the court finds that the affidavits from the abortion clinic employees reflect the position of the Plaintiffs in this case.

8. Although *Karlin* eventually reached the Seventh Circuit, the plaintiffs did not appeal this decision.

are not violated in this situation because the State has neither suppressed her speech nor required her to adopt or endorse the State's speech.[9] *See United States v. United Foods, Inc.,* 533 U.S. 405, 410, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) ("Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express certain views."); *Hill v. Colorado,* 530 U.S. 703, 716, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) ("The right to free speech, of course, includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience."). Moreover, the court does not believe the Supreme Court's "unwilling listener" line of cases can support a woman's claim because nothing in the evidence submitted suggests that "the degree of captivity" inherent in the exchange of information between a woman and her physician "makes it impractical for the unwilling viewer or auditor to avoid exposure" to the unwanted information. *Hill,* 530 U.S. at 717, 120 S.Ct. 2480. If a woman decides she does not want to examine the content of the State's information, the Act does not require her to do so. *Id.* at 716, 120 S.Ct. 2480 ("[O]ne of the reasons we tolerate a protester's right to wear a jacket expressing his opposition to government policy in vulgar language is because offended viewers can effectively avoid further bombardment of their sensibilities simply by averting their eyes.") (internal quotations omitted). Furthermore, no provision of the Act prohibits a physician from explaining, criticizing, or disavowing the State's information.

### Payment

Having concluded that the Act's compelled distribution provision is permissible, the court must determine whether the Act's compelled payment requirement violates the Plaintiffs' First Amendment rights. Only two other federal courts have previously considered this issue, and each reached a conclusion that conflicted with the other. The Plaintiffs urge the court to adopt the reasoning of *Karlin v. Foust,* 975 F.Supp. 1177, 1225 (W.D.Wis.1997), *aff'd in part, rev'd in part,* 188 F.3d 446 (7th Cir.1999), in which the district court held that a provision in Wisconsin's informed consent statute violated the First Amendment because it permitted the state to "charge abortion providers a fee for . . . the state-printed materials." The Wisconsin statute, like the Act, required that the materials be "physically give(n)" to any woman seeking an abortion. *Karlin,* 975 F.Supp. at 1187, 1225. On the other hand, the Defendants argue that the court should embrace *Eubanks v. Schmidt,* 126 F.Supp.2d 451, 461 (W.D.Ky.2000), which held that Kentucky's informed consent statute, which required only that the physician advise every patient of her right to review the materials if she chose and to be provided with the materials on request (*Eubanks,* 126 F.Supp.2d at 457), did not violate the First Amendment, even though it required physicians to purchase the state-produced materials. Because each of these cases relied principally on the Supreme Court's compelled speech cases, an

---

**9.** The Plaintiffs' Amended Class Action Complaint alleges that the abortion clinics are suing on behalf of themselves as well as their patients. *See* Amended Class Action Complaint, ¶¶ 9–11 (stating that the abortion clinics are suing "on [their] own behalf and on behalf of [their] patients for whom the Act would significantly impede—and in some cases preclude—access to abortion services"). Accordingly, the court must address the constitutionality of the Act with respect to the rights of both the named Plaintiffs as well as the women who may seek an abortion.

analysis of prior Supreme Court precedent is necessary in order to resolve the issue presented in this case.

 The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Although the text only speaks to acts of Congress, the First Amendment's protections apply equally to the States through the Fourteenth Amendment. *See, e.g., Harris v. Ostrout,* 65 F.3d 912, 916 (11th Cir.1995). "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government ... from compelling certain individuals to pay subsidies for speech to which they object." *United States v. United Foods, Inc.,* 533 U.S. 405, 410, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001). The latter of these two concerns is implicated in this case because the Act allows the State to require the Plaintiffs to pay a fee for state-authored materials that they find objectionable.

Although the Supreme Court case of *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), does not fall clearly into the Court's compelled contribution line of cases, it does provide some clues as to how the Court would decide the issue presented in this case.[10] In *Wooley,* the State of New Hampshire imposed criminal sanctions on anyone who obscured the words "Live Free or Die" on the State license plate. *Id.* at 707, 97 S.Ct. 1428. The plaintiffs in *Wooley,* followers of the Jehovah's Witnesses faith who found the motto repugnant to their moral, religious, and political beliefs, were arrested for covering up the motto and defended their actions on First Amendment grounds. *Id.* at 707–08, 97 S.Ct. 1428. The Supreme Court was "thus faced with the question of whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public." *Id.* at 713, 97 S.Ct. 1428. The Court engaged in a balancing test and ultimately determined that "where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment rights to avoid being a courier for such message." *Id.* at 717, 97 S.Ct. 1428. In dissent, then-Justice Rehnquist, joined by Justice Blackmun, argued that New Hampshire could "erect a multitude of billboards, each proclaiming 'Live Free or Die,' and tax all citizens for the cost of erection and maintenance" without violating the First Amendment, because such a case would not involve "an affirmation of belief" on the part of dissenting citizens. *Id.* at 722, 97 S.Ct. 1428 (Rehnquist, J., dissenting). Although the majority never responded to this idea in its opinion, the United States Court of Appeals for the Third Circuit has opined that the majority "apparently acquiesced to the dissent's observation that the state was free to tax all citizens for erection and maintenance of billboards bearing the state motto 'Live Free or Die.'" *United States v. Frame,* 885 F.2d 1119, 1132 (3d Cir.1989); *see* Laurence H. Tribe, *American Constitutional Law,* § 12–4, at 807 n. 14 (2d ed.1988) (stating that "the majority silently accepted Justice Rehnquist's assertion that

---

**10.** *Casey* distinguished *Wooley* by saying that the distribution of an ideological message under the statute at issue in *Casey* was required only as a part of the practice of medicine, subject to reasonable licensing and regulation by the State. *Casey,* 505 U.S. at 884, 112 S.Ct. 2791. *Casey,* however, did not consider the matter of compelled contribution to finance the materials distributed, since that was not required under the Pennsylvania statute there at issue.

citizens of New Hampshire could be compelled through their taxes to pay for the cost of [the billboard] even if they could not be compelled to display that proclamation on their license plates"). Based on this observation, Professor Tribe concludes that "a taxpayer would lose any such challenge on the merits." *Id.* Thus, the Court implicitly drew a distinction between the financing from general tax revenues of a publicly displayed ideological message and the financing of a state-endorsed ideological message by those required to display (or distribute) it.

Here, as in *Wooley,* the State has chosen to impose a direct assessment on those who are required to distribute the message, even though they disagree with it, rather than having the message financed from general tax revenues. Therefore, although the Supreme Court did not base its decision on a compelled contribution theory, that theory would support the application of *Wooley* to the payment issue now being considered, even though *Wooley* was distinguished by *Casey* in the distribution context.

Several months after *Wooley,* the Court decided its first compelled contribution case: *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). In *Abood,* the State of Michigan enacted legislation that permitted union representation of local governmental employees. *Id.* at 211, 97 S.Ct. 1782. Under an "agency shop" arrangement between the Detroit Federation of Teachers (union) and the Detroit Board of Education (employer), teachers who had not become union members within sixty days of hire had to pay the union a service charge equal to the regular dues required of union members. *Id.* at 212, 97 S.Ct. 1782. In other words, every teacher had to pay union dues or face the risk of discharge. *Id.* A group of teachers who were not formal members of the union

filed suit over the compelled payment requirement because the union was expending funds on various political, economic, and religious activities that the teachers found objectionable. *Id.* at 213, 97 S.Ct. 1782. In holding that the union's compelled payment requirement violated the teachers' First Amendment rights, the Supreme Court explained that "the Constitution requires only that [political] expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of government employment." *Id.* at 235–36, 97 S.Ct. 1782. Additionally, the Court held that a union could compel contributions in the furtherance of the union's collective bargaining activities but not ideological activities unrelated to collective bargaining. *Id.* at 236, 97 S.Ct. 1782. The Court, however, refused to "try to define ... a dividing line" between these two types of activities. *Id.* ("There will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited.").

More than a decade after *Abood,* the Court confronted its next compelled contribution case: *Keller v. State Bar of California,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). In *Keller,* members of the State Bar of California sued in state court alleging that the Bar violated their First Amendment rights by spending mandatory dues payments on political activities that certain members of the Bar found objectionable. *See id.* at 6, 110 S.Ct. 2228. The Court explained that "*Abood* held that a union could not expend a dissenting individual's dues for ideological activities not 'germane' to the purpose for which compelled association was justified: collective

bargaining." *Id.* at 13, 110 S.Ct. 2228. Applying this logic to the context of a state bar that compelled attorneys to pay dues in order to practice law, the Court held that the State Bar of California could use compelled dues in order to fund activities germane to its central purpose: regulating the legal profession and improving the quality of legal services. *Id.* at 14, 110 S.Ct. 2228. It could not, however, compel dissenting members of the bar to contribute funds for ideological activities that fell outside the Bar's central purpose. *Id.* After reaching this conclusion, the Court expanded on the question left unanswered in *Abood:* how to determine whether an activity is germane to an organization's central purpose. *Id.* The Court stated that "the guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred for the" central purpose of the compelled association.[11] *See id.*

During oral argument, the Defendants suggested that the *Abood/Keller* "germaneness analysis" should control the outcome of the First Amendment issue in this case. Specifically, the Defendants argued that the State of Alabama, similar to a union or bar association, may compel citizens to contribute funds in order to further the State's regulatory programs so long as those funds are germane to the State's central purpose. The State argued further that, in the context of this case, the State's central purpose is the regulation of physicians who provide abortion services to women. Therefore, pursuant to *Keller,* the Defendants conclude that the State may require dissenting physicians to contribute funds to pay for the State's informational materials because these funds are "reasonably incurred for the purpose of" regulating abortion providers. *See id.*

This argument by the Defendants takes an expansive view of the purpose of the Act which is not supported by the text of the Act itself.[12] Accepting the characterization that the purpose of the Act is to regulate abortion providers, the text of the Act as a whole makes it clear that it is not a statute of general regulation of abortion providers, but only a statute of regulation with regard to information which must be provided to patients of the abortion providers. That is, the Act does not seek to regulate any aspect of the providing of abortions other than the information the State has deemed necessary for a patient to make an informed decision.

The purpose of the Act is essential to the analysis of First Amendment compelled contribution claims under the Court's most recent compelled contribution case: *United States v. United Foods, Inc.,* 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001). Under the Mushroom Promotion, Research, and Consumer Information Act, 7 U.S.C. § 6101 *et seq.,* the Secretary of Agriculture is authorized to establish a Mushroom Council to pursue the statute's goals. *Id.* at 408, 121 S.Ct. 2334. In order to fund the council's program, the statute authorizes the council to

---

**11.** In *Lehnert v. Ferris Faculty Association,* 500 U.S. 507, 519, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991), the Court returned to the union context and further explained that a union could compel dissenting members to contribute funds as long as the chargeable activities: 1) are "germane to collective bargaining activity"; 2) are "justified by the government's vital policy interest in labor peace and avoiding free riders"; and 3) do not "significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop."

**12.** The purpose as stated in the Act itself is to "ensure that every woman considering an abortion receives complete information on the procedure, risks, and her alternatives and to ensure that every woman who submits to an abortion procedure does so only after giving her voluntary and informed consent to the abortion procedure." *Ala.Code* § 26–23A–3.

impose mandatory assessments upon all handlers of fresh mushrooms. *Id.* These fees are then used by the council for generic advertising in order to promote mushroom sales. *Id.* In 1996, a Tennessee-based agricultural distributor sued in federal court alleging that the forced subsidy for generic advertising violated its First Amendment rights. *Id.* at 408–09, 121 S.Ct. 2334. According to the Court, the issue presented was "whether the government may underwrite and sponsor a certain viewpoint using special subsidies exacted from a designated class of persons, some of whom object to the idea being advanced." *Id.* at 410, 121 S.Ct. 2334.

Relying on both *Abood* and *Keller,* the Supreme Court concluded that the mushroom council's "mandatory [assessment] is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech but must remain a member of the group by law or necessity." *Id.* at 413, 121 S.Ct. 2334. In reaching this decision, the Court held that "[a] proper application of the rule in *Abood* requires us to invalidate the instant statutory scheme." *Id.* Given this statement, this court understands *United Foods* as the Supreme Court's most recent articulation of how to apply the *Abood* analysis correctly.

Applying *Abood* to the facts of *United Foods,* the Supreme Court explained that "before addressing whether a conflict with freedom of belief exists, a threshold inquiry must be whether there is some state imposed obligation which makes group membership less than voluntary; for it is only the overriding associational purpose which allows any compelled subsidy for speech in the first place." *Id.* at 413, 121 S.Ct. 2334. In *Abood,* compelled association was present because the State of Michigan required all union and nonunion members to associate with each other un-

der a union shop arrangement in order to further the "desired benefits of collective bargaining." *Id.* at 414, 121 S.Ct. 2334. Similarly, in *Keller,* the State of California required all attorneys who wanted to practice law in that State to associate together into an integrated bar in order ensure that all lawyers would pay a fair share of the cost of regulating the legal profession and improving the quality of California's legal services. *See id.* In both cases, the States required compelled association in order to further broad regulatory governmental ends, namely collective bargaining and the regulation of attorneys. Because the States could require compelled association of individuals in order to further these goals, the Supreme Court held that compelled contributions were similarly permissible as long as they were "germane to the larger regulatory purpose that justified the association." *Id.*

Unlike *Keller* and *Abood, United Foods* involved a situation in which the government required compelled association of mushroom handlers not for a broader regulatory purpose, but only to compel them to fund speech, specifically advertising that promoted mushroom sales. *See id.* at 415, 121 S.Ct. 2334. ("[T]here is no broader regulatory program in place here."). Stated differently, the statutory scheme in *United Foods* did not require mushroom handlers to associate together in order to advance a broader regulatory end; instead, the only collective action mushroom handlers had with each other was paying a fee to the government. *See id.* ("[H]ere the statute does not require group action, save to generate the very speech to which some handlers object."). Although the Mushroom Protection Act authorized the council to engage in comprehensive regulation of the mushroom market, the Court found as a fact that the council's fees went only toward advertising and not some broader regulatory end.

*See id.* According to the Court, "the compelled contributions for advertising are not part of some broader regulatory scheme. The only program the Government contends the compelled contributions serve is the very advertising scheme in question." *Id.* Moreover, "the expression respondent is required to support is not germane to a purpose related to an association independent from the speech itself; and the rationale of *Abood* extends to the party who objects to the compelled support of this speech." *Id.* As a result of these differences from *Abood* and *Keller*, the Court was unwilling to uphold "compelled subsidies for speech in the context of a program where the principal object is speech itself." *Id.*

■ The court finds *United Foods* to be directly on point, since the State of Alabama requires abortion providers to associate themselves together only for the limited purpose of funding and disseminating speech.[13] Unlike *Abood* and *Keller*, the State has not required abortion providers to be associated with a larger collective organization that furthers a broad regulatory purpose. Instead, this case is much closer to the statute struck down in *United Foods* because the Act simply mandates that abortion providers pay money to the Alabama Department of Public Health, which in turn, will use the money to fund speech that the Plaintiffs find objectionable. The Defendants' argument that the compelled contribution at issue is germane to the purpose of the Act is, therefore, unavailing, for "[w]ere it sufficient to say speech is germane to itself, *Abood*'s and *Keller*'s limits would be empty of meaning and significance." *Id.* at 415, 121 S.Ct. 2334. Like *United Foods*, the expression that the Plaintiffs are required to support "is not germane to a purpose related to an

association independent from the speech itself." *Id.* No other association, and thus no "overriding associational purpose," exists. Since "it is only [an] overriding associational purpose which allows any compelled subsidy for speech in the first place, *Id.* at 413, 121 S.Ct. 2334, *Abood*'s prohibition on compelled speech applies in this case." Consequently, this court concludes that the Act's compelled payment provision violates the First Amendment, insofar as it applies to providers of abortion services.

■ In summary, the Plaintiff providers of abortion services constitutionally may be required to distribute the state-prepared materials, and offer for viewing the state-prepared videotape, advancing policy positions with which they disagree, i.e., the preference of alternatives to abortion, but they may not be compelled to finance the production of the materials and videotape. The court concludes that the final sentence of § 26–23A–5(c) of the Act ("The department may charge a reasonable fee based on the cost of producing the materials and videotape.") violates the First Amendment to the extent that it might be applied to providers of abortion services who are required to distribute the materials and offer the videotape for viewing. Pursuant to the Act's severability clause, this sentence must be severed from the Act to that extent and the remainder of the Act "shall remain effective." *Ala.Code* § 26–23A–13. Accordingly, the Defendants' Motion for Summary Judgement on the Plaintiffs' Tenth Claim for Relief and the Plaintiffs' cross-motion for Summary Judgment on their Tenth Claim are due to be GRANTED in part and DENIED in part, as stated herein.

---

**13.** In actuality, neither this case nor *United Foods* involved any type of formal group membership, as the statutes at issue simply required a designated class of persons to contribute money that was later spent on speech that some members found objectionable.

### B. *Eleventh Claim: Civil Remedy Provision and Prima Facie Presumptions*

Section 10(a) of the Act creates the following civil remedy for violations of the Act:

> In addition to whatever remedies are available under the common or statutory law of this state, failure to comply with the requirements of this chapter shall:
>
> (a) Provide a basis for a civil action for compensatory and punitive damages. *Any conviction under this chapter shall be admissible in a civil suit as prima facie evidence of a failure to obtain an informed consent or parental or judicial consent.* The civil action may be based on a claim that the act was a result of simple negligence, gross negligence, wantonness, willfulness, intention, or other legal standard of care.

*Ala.Code* § 26–23A–10(a) (emphasis added). In support of their motion for partial summary judgment, the Plaintiffs argue that the prima facie evidence provision of this section violates the Due Process Clause of the Fourteenth Amendment for two reasons. First, the Plaintiffs contend that no logical connection exists between a physician's failure to comply with the Act and a physician's failure to obtain parental or judicial consent.[14] Second, the Plaintiffs argue that § 10(a) is overly broad because a prior conviction under the Act could be used as prima facie evidence of a failure to obtain informed consent in a malpractice action, even though the meaning of "informed consent" under the Act is very different from "informed consent" in the malpractice context. The court need not reach the merits of these two arguments, however, as the court agrees with the Defendants that the Plaintiffs' Eleventh Claim is barred by the Eleventh Amendment.

■ The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although the text of the Amendment does not bar suits against a state by its own citizens, the Supreme Court has consistently held that an unconsenting state is immune from suits brought in federal court by its own citizens as well as by citizens of another state. *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The state need not be named as a defendant for this prohibition to apply; suits against individual state officials in which the state is the real party in interest are also barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–02, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

■ Under the doctrine announced in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), however, suits against state officers seeking prospective equitable relief to end continuing violations of federal law are not barred by the Eleventh Amendment. *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Services,* 225 F.3d 1208, 1220

---

14. For example, the Plaintiffs imagine a situation in which a physician's conviction under the Act for failing to maintain properly functioning video equipment is used as prima facie evidence of a failure to obtain parental consent. *See Ala.Code* § 26–21–3(a) (stating that "no person shall perform an abortion upon an unemancipated minor unless he or his agent first obtains the written consent of either parent or the legal guardian of the minor"); § 26–23A–6 (stating that abortion facilities "shall have video viewing equipment").

(11th Cir.2000). This exception is based on the "legal fiction" that state officers who enforce unconstitutional laws act without the state's authority, thus they are not protected by the Eleventh Amendment. *See Summit Med. Assocs., P.C. v. Pryor,* 180 F.3d 1326, 1336–37 (11th Cir. 1999).[15] In order for the *Ex parte Young* exception to apply, the state officer must have "*some responsibility* to enforce the statute or provision at issue." *Id.* at 1341 (emphasis added). A state officer who has "no authority to enforce the challenged statute" is therefore immune from suit under the Eleventh Amendment. *Id.* at 1342. The crux of the Eleventh Amendment issue in this case is whether the named Defendants, Alabama's Governor, Attorney General, Health Officer, and District Attorneys, have the requisite degree of enforcement responsibility under the Act's civil liability provision— § 10(a)—for the *Ex parte Young* exception to apply.

The Defendants argue that this issue is fully resolved by the Eleventh Circuit's decision in *Summit Medical Associates, P.C. v. Pryor,* 180 F.3d 1326 (11th Cir. 1999). In *Pryor,* the court held that the plaintiffs' constitutional challenge to the civil remedy section of Alabama's partial birth abortion statute was barred by the Eleventh Amendment because the defendants—the Governor, Attorney General, and a class of District Attorneys—did not have "any relationship to the enforcement of this provision." *Id.* at 1342. The statute at issue in *Pryor* provided a civil cause of action for compensatory and punitive damages to "[t]he father, if married to the mother at the time she receives a partial-birth abortion procedure, and if the mother has not attained the age of 18 years at the time of the abortion, the maternal grandparents of the fetus." *Id.* at 1329 n. 2 (quoting *Ala.Code* § 26–23–5). Because "only a *husband* or a *maternal grandparent*" could sue under this statute, the court concluded that *Ex parte Young* did not apply because the state officials had "no authority to enforce the challenged statute." *Id.* at 1342 (emphasis in original). Like the civil statute in *Pryor,* the Defendants in this case contend that the civil action created by § 10(a) of the Act "is not one that the Governor, Attorney General, State Health Officer, or District Attorney of Montgomery County would file." Brief In Support of Defendants' Motion for Summary Judgment and To Dismiss, p. 41. Accordingly, they conclude that the Plaintiffs' Eleventh Claim is barred by the Eleventh Amendment.

Despite the succinctness of this argument, the Plaintiffs point to a significant difference between the § 10(a) and the partial-birth abortion statute. Unlike the partial-birth abortion statute at issue in *Pryor,* § 10(a) does not limit who can bring a cause of action. More specifically, § 10(a) creates a civil cause of action for compensatory and punitive damages, but never says who can and cannot bring such an action. *See Ala.Code* § 26–23A–10(a) (stating that failure to comply with the requirements of the Act shall "provide a basis for a civil action for compensatory and punitive damages"). Drawing on this distinction, the Plaintiffs argue that the Attorney General could file an action under § 10(a) pursuant to his general authority "to institute and prosecute, in the name of the state, *all civil actions* and other proceedings necessary to protect the rights and interests of the state." *Ala. Code* § 36–15–12 (emphasis added).[16] Because the State of Alabama is in a position to seek civil damages under § 10(a)

**15.** *Summit Medical Associates, P.C. v. James,* 984 F.Supp. 1404 (M.D.Ala.1998) (Thompson, C.J.), *aff'd in part, rev'd in part, sub nom. Summit Medical Associates, P.C. v. Pryor,* 180 F.3d 1326 (11th Cir.1999), involved a constitutional challenge by many of the same plaintiffs in this case to Alabama's Partial–Birth

Abortion Ban Act of 1997, *Ala.Code* §§ 26–23–1 to 6, and the Abortion of Viable Unborn Child Act, *Ala.Code* §§ 26–22–1 to 5.

**16.** The Plaintiffs do not argue that the Governor, Health Officer, or District Attorneys could bring an action under § 10(a).

against abortion providers for failing to comply with the Act, the Plaintiffs conclude that the *Ex parte Young* exception is applicable to this case.

Although the court agrees with the Plaintiffs that this case is distinguishable from *Pryor,* this acknowledgment is not dispositive of the centra before the court: whether the Attorney General's connection to § 10(a) is sufficiently intimate to fall within the *Ex parte Young* exception. Resolution of this issue requires inquiry into "how close a connection is required between the defendant state officers and the enforcement of the act." *Okpalobi v. Foster,* 244 F.3d 405, 412 (5th Cir.2001) (en banc) (addressing whether state officers have Eleventh Amendment immunity from suit challenging the constitutionality of a Louisiana statute creating a civil remedy to a mother injured during abortion procedure).[17] The Supreme Court first discussed the proper degree of such a connection in *Fitts v. McGhee,* 172 U.S. 516, 19 S.Ct. 269, 43 L.Ed. 535 (1899).

*Fitts* involved a constitutional challenge to an Alabama statute that imposed certain maximum rates of toll that could be charged by the owners of the "Florence Bridge," a bridge crossing the Tennessee River between Colbert County and Lauderdale Counties. *Id.* at 516, 19 S.Ct. 269. The statute also contained the following civil remedy provision:

> That should the owners, lessees or operators of said toll bridge, by themselves or any of their agents, demand or receive from any person a higher rate of toll than is prescribed by this act, he or they shall forfeit to such person twenty dollars for each offense, to be recovera-

ble before any justice of the peace or notary public and ex-officio justice of the peace of either of said counties of Colbert or Lauderdale.

1894–95 *Ala. Acts* 226, § 2; *Fitts,* 172 U.S. at 516, 19 S.Ct. 269. The owners of the bridge sued the Governor and Attorney General in federal court alleging that the law was "arbitrary, unreasonable, and amounted virtually to the confiscation of the plaintiffs' property; and that the act was in violation of the constitution of the United States." *Fitts* 172 U.S. at 517, 19 S.Ct. 269. Due to their belief that the law was unconstitutional, the owners continued to charge their regular toll rates instead of the rates fixed by the act. Consequently, numerous citizens who were paying the higher rates "threatened to institute suit or suits against the plaintiffs under the penalty clause of the act, and ... also threatened to procure proceedings to be instituted in the courts by the governor and attorney general in the name of the state, by a mandamus or otherwise, to compel the plaintiffs to pass people over the bridge at the rates fixed by the act." *Id.* at 518, 19 S.Ct. 269. As a result of these litigation threats, the bridge operators filed a bill of equity requesting that the court issue an injunction "prohibiting and restraining" the Governor, Attorney General, "and all persons whomsoever[ ] from instituting any proceeding against the [bridge operators] under the forfeiture clause ... set out in the second section of the act." *Id.* at 518, 19 S.Ct. 269. In response, the state officers moved that "the bill be dismissed upon the ground that the suit was one against the state, and prohibited by the constitution of the United States." *Id.*

---

**17.** Fourteen members of the Fifth Circuit participated in this decision. Seven judges concluded that the suit should be dismissed on Eleventh Amendment grounds. Nine judges concluded that the suit should be dismissed on Article III standing grounds. *Okpalobi,*

244 F.3d at 408. The five dissenting judges argued that neither the Eleventh Amendment nor Article III prevented the court from hearing the merits of the plaintiffs' challenge. *Id.* at 432–53.

In addressing whether the Governor and Attorney General had the requisite enforcement connection to the toll statute's civil remedy provision, the Court observed that none of the state officials "appear to have been charged by law with any special duty in connection with" the statute. *Id.* at 529, 19 S.Ct. 269 (emphasis added). Furthermore, the Court stated the following:

> There is a wide difference between a suit against individuals, holding official positions under a state, to prevent them, under the sanction of an unconstitutional statute, from committing by some positive act a wrong or trespass, and a suit against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state. In the present case, neither of the state officers named held any special relation to the particular statute alleged to be unconstitutional. They were not expressly directed to see to its enforcement. If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes. That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the states of

the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons.

*Id.* at 530, 19 S.Ct. 269. Based upon this reasoning, the Court concluded that the Eleventh Amendment barred the bridge operators' challenge to the toll rate statute. *See id.* at 530–31, 19 S.Ct. 269.

Notwithstanding the passage of one hundred and four years, *Fitts* controls the outcome of this case due to the similarities between the Act and the toll statute. First, both § 10(a) of the Act and § 2 of the toll statute create general civil remedies that do not expressly limit who may bring an action. In *Fitts,* the statute merely stated that offending toll operators shall forfeit twenty dollars to any person charged an excessive toll; it did not say that actions to recover this money were limited only to injured parties. *Compare Pryor,* 180 F.3d at 1342 (stating that only a husband or a maternal grandparent could sue for damages). Indeed, the texts of both the toll statute and the Act are broad enough to permit both private citizens and public officials to file civil actions.

Second, both statutes are not of the type that permit state officers to take affirmative action that would result in a wrong or trespass outside of formal judicial proceedings. In *Fitts,* the only way the State could act under the toll statute was to initiate a civil action against the bridge operator for twenty dollars. Similarly, the only way the State could act under § 10(a) of the Act would be to file an action for damages against an abortion provider.

Third, the Plaintiffs in this case, like the bridge operators in *Fitts,* contend that because the Attorney General has the ability to bring an action under § 10(a) pursuant to his general enforcement powers, a sufficient connection exists between the state officials and the statute.[18] As explained

---

**18.** The Alabama statute delineating the powers of the Attorney General with respect to

above, however, the Supreme Court rejected this precise argument, noting that the connection required to overcome the State's Eleventh Amendment immunity must be based on something more than a theory that the Attorney General "might represent the state in litigation involving the enforcement of its statutes." *Id.* at 530, 19 S.Ct. 269. Although the Plaintiffs contend that such a possibility exists in this case, the court cannot even imagine a situation in which the Attorney General would sue on behalf of the State for damages under § 10(a) of the Act. In *Fitts,* at least the possibility existed that a state official might be charged an excessive toll rate, thus the Attorney General could bring an action to recover twenty dollars on behalf of the State. In this case, no such possibility exists because the State will not be undergoing an abortion procedure.

Finally, both laws are "self-enforcing" in the sense that the State has no direct enforcement authority to remedy statutory violations. For example, if the bridge operators in *Fitts* charged an excessive toll, the statute required the operator to forfeit twenty dollars to the injured person. Although the statute was seemingly broad enough to permit the State to bring an action on behalf of the injured person, the State simply did not have any direct involvement in the recovery of these funds because enforcement rested primarily with the injured person. Similarly, if an abor-

tion provider does not comply with the informed consent provisions of the Act, the injured person from a civil liability perspective is not the State, but the woman who failed to receive complete information. Consequently, the aggrieved woman is the injured party who is given primary enforcement power to recover compensatory and punitive damages. *See Shell Oil Co. v. Noel,* 608 F.2d 208, 212 (1st Cir.1979) ("[I]t has been held that in an action attacking the constitutionality of a statute a governor or an attorney general has not a sufficiently intimate connection with the statute to be a proper defendant if all that is shown is that the statute in question determines the right of one private person to recover from another.").

Although *Fitts* was a precursor case to *Ex parte Young,* it nevertheless remains good law. In *Ex parte Young,* the Court quoted from *Fitts* and reaffirmed its basic proposition that a state officer must have "some connection with the enforcement of the act" to overcome Eleventh Amendment immunity.[19] 209 U.S. at 157, 28 S.Ct. 441. In holding that a suit against the Minnesota Attorney General to enjoin enforcement of a railroad rate statute was not barred by the Eleventh Amendment, the Court distinguished *Fitts* by explaining that "[t]he penalties for disobeying [the toll act] ... were to be collected by the persons paying them. No officer of the state had any official connection with the recovery of

---

civil actions has not changed in any material fashion since *Fitts.* *Compare Ala.Code* § 2029 (1896) ("The attorney-general is authorized to institute and prosecute, in the name of the state, all suits and other proceedings at law or in equity, requisite and necessary to protect the rights and interests of the state."), *with Ala.Code* § 36–15–12 (1975) ("The Attorney General is authorized to institute and prosecute, in the name of the state, all civil actions and other proceedings necessary to protect the rights and interests of the state.").

**19.** Additionally, *Young* expanded on *Fitts* by explaining that this connection could "arise out of the general law" or "the same act which is to be enforced." *Id.* (stating that "whether [the connection] arises out of the general law, or is specially created by the act itself is not material so long as it exists."). In other words, *Young* merely clarified how this connection could be established, it did not alter the requirement that "some connection" exist. *See Okpalobi,* 244 F.3d at 417–18 (explaining that no conflict exists between *Fitts* and *Young* ).

such penalties." *Young*, 209 U.S. at 156, 28 S.Ct. 441. In contrast, *Young* involved a challenge to a statute that was not self-enforcing, as the statute in question imposed only monetary penalties and fines, to be collected by the State, on anyone who charged excessive rates.[20] *Id.* at 127–28, 28 S.Ct. 441. Because the Minnesota Attorney General had a duty under Minnesota law to initiate judicial proceedings against "any corporation whenever it shall have offended against the laws of the state[,]" the Court concluded that the Attorney General was "sufficiently connected ... with the duty of enforcement to make him a proper party to a suit ... before the United States circuit court." *Id.* at 161, 28 S.Ct. 441. More recently, the Fourth, Fifth, and Eleventh Circuits have cited *Fitts* favorably in opinions discussing the scope of the *Ex parte Young* connection requirement. *See Lytle v. Griffith*, 240 F.3d 404, 412 (4th Cir.2001) (citing *Young* and *Fitts* for the proposition that a state officer must have a "special relation" to the challenged statute in order to overcome Eleventh Amendment immunity); *Okpalobi*, 244 F.3d at 412–15, 418 (concluding that *Fitts* is both distinguishable and consistent with *Young* ); *Pryor*, 180 F.3d at 1341–42 (quoting *Fitts* in explaining the "nature of th[e] 'connection' between the state officer and the challenged statute").

▋ In sum, the Plaintiffs' Eleventh Claim for relief does not fall within the *Ex parte Young* exception to the Eleventh

Amendment due to the absence of a sufficient enforcement connection between the Defendants and § 10(a) of the Act. Consequently, the Eleventh Amendment bars the Plaintiffs' challenge to § 10(a). Accordingly, the Defendants' Motion for Summary Judgement on the Plaintiffs' Eleventh Claim is due to be GRANTED, with this claim being dismissed for want of jurisdiction, and the Plaintiffs' cross-motion for Summary Judgment is due to be DENIED.[21]

### V. CONCLUSION & ORDER

For the reasons stated above, the court finds that the State constitutionally may require abortion providers to distribute to all patients seeking abortions the state-sponsored materials, and offer for viewing the videotape, which advance a preference of childbirth over abortion, but may not compel abortion providers to pay for the materials and videotape which they are required to distribute or offer for viewing. Therefore, it is hereby ORDERED as follows:

1) The Defendants' Motion for Partial Summary Judgment and To Dismiss is GRANTED as to the Plaintiffs' First, Third, Fourth, Fifth, and Ninth claims on the basis that Plaintiffs are no longer pursuing those claims.

2) As to the Plaintiffs' Second, Sixth, Seventh and Eighth Claims, the Defen-

---

**20.** Unlike the statutes involved in *Fitts* and this case, the Minnesota statute in *Young* did not create a cause of action in favor of the aggrieved party who had to pay the excessive rate fee.

**21.** The Plaintiffs make a persuasive argument that application of this presumption to establish lack of parental or judicial consent would constitute an impermissible shifting of the burden of production with no logical or legal basis for doing so. This case, however, is

simply not the proper vehicle for the challenge. Although this court is not in a position to address the merits of the Plaintiffs' constitutional challenge to § 10(a), this decision does not mean that "an allegedly unconstitutional statute will remain on the books in [Alabama]." *Okpalobi*, 244 F.3d at 419 n. 40. Once a plaintiff files an action for compensatory or punitive damages under § 10(a), the defendant abortion provider "can immediately and forthwith challenge the constitutionality of [§ 10(a)]." *Id.*

dants' Motion for Summary Judgment and To Dismiss is DENIED AS MOOT.

3) As to the Plaintiffs' Tenth Claim, Defendants' Motion for Summary Judgment is GRANTED as to the required distribution provision of *Ala.Code*, § 26–23A–4(a) and DENIED as to the compelled payment provision of *Ala.Code*, § 26–23A–5(c), insofar as it may apply to providers of abortion services.

4) As to the Plaintiffs' Eleventh Claim, Defendants' Motion for Summary Judgment is GRANTED on the basis of Eleventh Amendment immunity, and Plaintiffs' Eleventh Claim is DISMISSED without prejudice for want of jurisdiction.

5) The Plaintiffs' Motion for Summary Judgment as to the Tenth Claim is DENIED as to the required distribution provision of *Ala.Code*, § 26–23A–4(a), GRANTED as to the compelled payment provision of *Ala.Code*, § 26–23A–5(c), and DENIED as to the Eleventh Claim.

6) The last sentence of *Ala.Code* § 26–23A–5(c), reading "The department may charge a reasonable fee based on the cost of producing the materials and videotape," is declared to be unconstitutional to the extent that it may be applied to providers of abortions and is severed from the statute to that extent.